## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SPM CORPORATE SERVICES LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | |
| | ) | JURY TRIAL DEMANDED |
| IRONSHORE INDEMNITY, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## COMPLAINT

SPM Corporate Services LLC ("SPM CS" or "First Named Insured") commences this action seeking coverage from Ironshore Indemnity, Inc. ("Ironshore") on its excess liability crime liability insurance policy and a finding of bad faith consistent with 42 Pa.C.S. § 8371, as a result of Ironshore's purposeful and unreasonable delay in investigating SPM CS' claim. Acting in bad faith, Ironshore has continued for more than a year to demand excessive and unwarranted documents, information, and interviews from SPM CS, and refuses to make a determination on coverage under its policy. This, despite the fact that SPM CS has submitted countless documents, engaged in numerous telephone calls and meetings, and received payment in full from the underlying policy holder as a result of the same proof of claim. As a result, SPM CS has no choice but to seek court intervention to force Ironshore to live up to its contractual commitment to provide coverage for SPM CS against an indisputable multi-million dollar employee theft. Ironshore's purported reasons for not doing so are entirely specious and warrant a finding of bad faith.

## INTRODUCTION

1.      SPM CS has been insured by Ironshore for two years, paying over $17,000 in premiums over the course of the relationship to date. The insurance policy provided by Ironshore, as an excess policy to another insurer, provides SPM CS protection in the event that SPM CS or any of its additionally insured is the victim of certain enumerated crimes. In January 2017, one of the additional insured companies under the Ironshore policy was the victim of exactly the type of crime for which SPM CS had purchased its policy from Ironshore.

2.      For more than a year, SPM CS has attempted to work with Ironshore to accurately document its claim for coverage under the Ironshore policy for employee theft. It has cost SPM CS a significant amount of resources – both time and money – to investigate the facts and gather the necessary documentation, in an attempt to work through Ironshore's requests for more and more granular information, much of which is seemingly unrelated to the claim. Regardless of SPM CS' good faith cooperation with Ironshore's investigation, SPM CS has been treated with suspicion, distrust, and a vigorous and far-reaching investigation that is unwarranted and unreasonable under the circumstances. Very quickly after SPM CS filed its claim, Ironshore brought in outside legal counsel who has engaged in exhaustive investigative tactics, going as far as demanding an in-person meeting at SPM CS' headquarters in order to confirm the identities of the employees interfacing with Ironshore regarding the claim, and sending SPM CS lengthy letters on a near-monthly basis with excessive demands for documents, information, and interviews.

3.      SPM CS has attempted to work diligently with Ironshore and its legal counsel for more than a year in an effort to finalize the claim and receive payment, yet Ironshore continues

its dilatory tactics, unreasonably demanding SPM CS provide more and more documentation, information, and employees for interviews, much of which Ironshore is neither entitled to as part of its investigation nor is the information sought related to the claim. In spite of SPM CS' efforts, progress on SPM CS' claim has been nearly nonexistent. Moreover, despite repeated requests from SPM CS, Ironshore still refuses to tell SPM CS what documented proof would be sufficient for it to process SPM CS' claim. In fact, Ironshore has been both so far-reaching and so nebulous with its requests that the only thing it has made clear is that even if SPM CS provided all of the extensive categories of documents and information requested, and Ironshore was able to conduct all of the requested interviews, those do not necessarily represent a comprehensive list of all that Ironshore requires to determine whether a payout on the claim is even potentially available.

4.      In spite of SPM CS' good-faith and more-than-a-year-long efforts to cooperate with Ironshore's investigation, including continually requesting clarification as to exactly what is needed by Ironshore to satisfy its investigation, Ironshore has ignored SPM CS' requests, while at the same time making unreasonable demands for documents, information, and interviews, in an attempt to delay the investigation, and any potential payout therefrom.

## PARTIES

5.      SPM CS is a corporation duly formed and organized under the laws of the State of Delaware with a principal place of business at 2501 Seaport Drive, Suite SH109, Chester, Pennsylvania 19013.

6.      Ironshore is a corporation duly formed and organized under the laws of the State of Minnesota with a principal place of business in the State of New York, and at all relevant times has been engaging in the business of insurance within the State of Pennsylvania.

## JURISDICTION AND VENUE

7.     This Court has subject matter jurisdiction over this action under 28 U.S.C § 1332, because the parties are citizens of different states and the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs.

8.     This Court has personal jurisdiction over Ironshore because Ironshore is authorized to sell or write insurance in Pennsylvania, and, at all material times, has conducted and continues to conduct substantial insurance business in the State of Pennsylvania, including engaging in the business of selling insurance, investigating claims, and/or issuing policies that cover policyholders or activities located in Pennsylvania.

9.     This Court's exercise of personal jurisdiction over Ironshore, who maintains corporate offices at 50 South 16th Street, Suite 3410, Philadelphia, PA 19102, would not offend traditional notions of fair play and substantial justice.

10.     Venue is proper in this District, pursuant to 28 U.S.C. § 1391, because SPM CS' offices are in the District, Ironshore issues the Policy in this District and has a corporate office in this District, and many of the acts and omissions asserted herein occurred in this District.

## FACTS

**I.     The Insurance Policies**

11.     SPM CS purchased Wrap + Crime Policy number 106446911 from Travelers Casualty and Surety Company of America for the policy period February 22, 2016 to February

22, 2017 (the "Travelers Policy" or "Followed Policy"), a true and accurate copy of which is attached here to as **Exhibit A**.

12.      In addition to SPM CS, the Travelers Policy provides coverage for a number of Additional Insureds, including, but not limited to, SPM Global Services PTE ("SPM").

13.      Nonetheless, under Section V.A.7. of the Travelers Policy, SPM CS, as First Named Insured, is responsible for the payment of all premiums.

14.      Further, under Section II.A.1., SPM CS must bring any claims under the policy, including lawsuits, and receives all payments under the Travelers Policy because "If the Insured consists of more than one entity, then the First Named Insured acts for itself and for every other Insured for all purposes of this Crime Policy."

15.      The Travelers Policy provides coverage for a wide variety of criminal and fraudulent activities, including, but not limited to, "Employee Theft."

16.      With regard to coverage for "Employee Theft," the Travelers Policy provides under Section I.A.1. that "[t]he Company will pay the Insured for the Insured's direct loss of, or direct loss from damage to, Money, Securities and Other Property directly caused by Theft or Forgery committed by an Employee, whether identified or not, acting alone or in collusion with other persons."

17.      The Travelers Policy provides for a  "Single Loss Limit of Insurance" for Employee Theft of $500,000, subject to a $10,000 retention.

18.     In order to supplement the insurance limits of the Travelers Policy, SPM CS purchased an Excess Liability Insurance Policy, policy number 002642701, from Ironshore (the "Ironshore Policy" or "Excess Policy"), a true and accurate copy of which is attached hereto as **Exhibit B**.

19.     Per the terms of the Ironshore Policy, Ironshore "agrees to provide insurance coverage to the Insureds in accordance with the terms, definitions, conditions, exclusions and limitations" of the Travelers Policy, except as otherwise provided in the Ironshore Policy. Exhibit B, Excess Liability Insurance Policy, p. 1, ¶ I.

20.     The Ironshore Policy provides "Limit of Liability" of $9,500,000 in excess to the Travelers Policy for all combined losses under all coverages under the Travelers Policy.

## II.     The Theft

21.     On April 11, 2011, Lim Khai Choo ("Lim" or "Christine Lim") was offered employment at SPM as an administrative and finance manager in the Singapore office.

22.     In her role as an administrative and finance manager, Lim was tasked with providing administrative and finance services for SPM, and two of SPM's clients, Optymyze Pte. Ltd. ("OPL"), and Synygy Pte. Ltd. ("SPL").

23.     Lim's duties included:

   a.   Managing the bank accounts of SPM, OPL, and SPL;

   b.   Making payments to vendors and employees on behalf of SPM, SPL, and
        OPL;

    c.   Submitting both monthly bank statements and a list of payments made each month to the SPM Finance Department on behalf of SPM, OPL, and SPL;

    d.   Filing corporate taxes for SPM, OPL, and SPL, and personal income taxes for SPM's managing director; and

    e.   Performing other corporate secretary duties for SPM, OPL, and SPL as needed.

24.    In her role as an administrative and finance manager, Lim was given access to the checkbooks, online bank passwords, and bank tokens for SPM's bank accounts.

25.    Lim was terminated on December 12, 2016 for poor performance, including deteriorating communication and unresponsiveness.

26.    Following Lim's termination, SPM discovered irregularities in the SPM bank accounts.

27.    After an extensive investigation in which SPM's General Counsel engaged an outside investigative consultant, SPM discovered that Lim executed hundreds of unauthorized transactions from the SPM bank accounts (collectively, the "Unauthorized Transactions").

28.    Lim engaged in numerous methods of stealing from SPM including, but not limited to, direct wire-transfers to herself and entities and people to which she was connected, falsifying payroll to increase her salary and provide herself bonuses, forging checks to herself and other entities to which she was connected, and making unauthorized cash withdrawals.

29.    The Unauthorized Transactions totaled in the millions of dollars.

30.     The Unauthorized Transactions were transferred and/or deposited into three personal bank accounts belonging to Lim, as well as into a corporation at which Lim is a manager, and to another person to whom Lim is closely connected.

## III.    The Claim

31.      Subsequent to the discovery of Lim's theft, on February 8, 2017, SPM CS submitted a claim for $2,985,583 (USD) under the Travelers Policy for Employee Theft and Employee Theft of Client Property (the "Travelers Claim").

32.     On December 5, 2017, after reviewing the Travelers Claim, Travelers paid SPM CS $500,000 minus the $10,000 retention, the full single loss limit for Employee Theft.

33.     SPM CS then submitted a claim with Ironshore on March 31, 2017, under the Ironshore Policy for $2,985,583 minus the recovery from Travelers, the outstanding portion of the loss suffered as a result of Lim's theft (the "Ironshore Claim").

34.      On March 31, 2017, with the Ironshore Claim, SPM CS provided Ironshore with a certified and attested to Proof of Loss prepared by Ayrin Widjaja, Lim's supervisor (the "Proof of Loss"), as well as a comprehensive spreadsheet detailing each of the Unauthorized Transactions with references to extensive supporting documentation for each claim.

35.     On May 2, 2017, Ironshore retained legal counsel to assist with the Ironshore Claim, including investigating the contents of the Proof of Loss.

36.     From May 2, 2017 through the present, Ironshore, through their legal counsel, has sent SPM CS at least nine letters and numerous emails regarding the Ironshore Claim, and has

had multiple in-person and telephonic conversations with SPM CS representatives regarding the Ironshore Claim – none of which have advanced resolution of the claim, but only served to repeat and add irrelevant and burdensome requests without acknowledging proofs provided or even definitively stating what is truly necessary to process the claim.

37.     For example, on or about August 10, 2017, Ironshore's counsel and an Ironshore representative met in person at SPM CS' headquarters with three SPM CS representatives, including SPM CS' general counsel.

38.     On the day of that meeting, August 10, 2017, SPM CS sent Ironshore numerous additional documents supporting its claim, and, at the meeting, it was agreed that Ironshore would provide a definitive list of evidentiary material required by Ironshore to accept SPM CS' claim.

39.     After four weeks, Ironshore had not yet provided the definitive list, instead sending SPM CS an email on September 11, 2017, repeating the prior exhaustive demands for documents, information, and interviews.

40.     In response, SPM CS requested another meeting via telephone with the same group of representatives as the previous meeting, which occurred on September 14, 2017. Once again, SPM CS reiterated its request that Ironshore provide a more definitive list of necessary evidentiary information, and Ironshore once again agreed.

41.     After another few weeks, Ironshore once again failed to provide the requested definitive list to SPM CS, and instead, on October 3, 2017, sent SPM CS another letter mirroring

prior letters and emails with an excessive list of demands for documents, information, and interviews.

42.     Notwithstanding Ironshore's failure to provide the previously agreed upon definitive list of necessary evidentiary information, in response to the October 3, 2017 letter, SPM CS compiled additional documentary proofs along with a spreadsheet of itemized losses claimed and sent them to Ironshore on October 25, 2017.

43.     Ironshore responded on November 10, 2017, again on December 12, 2017, and again on January 12, 2018, with the same repeated broad and undefined demands of proof for the claim. None of the communications included the previously agreed upon definitive list of necessary evidentiary information.

44.     On February 7, 2018, SPM CS delivered another comprehensive compilation of losses to Ironshore.

45.     More than six weeks later, on March 23, 2018, Ironshore responded with another letter containing the same excessive list of demands for documents, information, and interviews.

46.     In response, SPM CS sent an email correspondence requesting another meeting via telephone to revisit the discussions from August and September 2017 concerning a definitive list of evidentiary material required by Ironshore.

47.     On March 29, 2018, Ironshore responded by ignoring the request for a meeting, and, again making the same excessive list of demands for documents, information, and interviews contained in previous communications.

48.     On or about May 26, 2018, SPM CS sent a letter to Ironshore with further exemplar documented proofs for the different types of fraud perpetrated by Lim, again requesting a response from Ironshore regarding whether the proof was sufficient and, if not, for a definitive list of necessary evidentiary materials.

49.     As of the date of this filing, Ironshore still has not responded to SPM CS' latest letter containing further supporting documentation and information, as well as another request for a definitive list of necessary evidentiary materials.

50.     Throughout this time, to the extent document and information requests were related to the Ironshore Claim, SPM CS has either:

   a.   Provided them to Ironshore; or,

   b.   Provided Ironshore with documentary support examples for each type of Unauthorized Transactions as part of its repeated specific request that Ironshore advise SPM CS of whether the documentation provided would be sufficient proof for processing and paying out the Ironshore Claim.

51.     Ironshore never provided SPM CS with a response to its repeated requests regarding a defined list of necessary evidentiary information, or, in the same vein, whether the exemplar documentary support submissions were sufficient to process and payout the Ironshore Claim. Rather, as set forth above, it responded to every request and every submission with further broad and overreaching requests for documents, information, and interviews.

52.     The documents and information provided plainly demonstrated Lim's theft and the extensive actions undertaken by Lim to hide her actions from others at SPM.

53.     However, throughout these frequent communications, Ironshore made extensive requests for extraneous documentation that was patently outside of the scope of the Ironshore Claim investigation, and was unduly burdensome to SPM CS.

54.     The requests ranged from all of SPM CS' material submissions to and communication with Travelers regarding the Travelers Claim, to all of Lim's emails with the SPM finance department for the entirety of her employment, to all corporate records identifying all officers, directors, and owners of SPM CS and SPM from January 2013 to the present.

55.     It was made clear to SPM CS throughout the course of Ironshore's communications that unless and until the requested documents were provided in full, Ironshore would not make a determination on whether or not there was the potential for coverage for the Ironshore Claim.

56.     In addition to the extensive document requests, Ironshore also requested unbounded interviews with numerous employees in the United States and in Singapore including, but not limited to, the CEO of SPM CS,  all employees of SPM who has had regular communications with Lim, the Director of Finance at SPM CS, the drafter of the Proof of Loss, and everyone who compiled the loss documentation.

57.     Moreover, Ironshore repeatedly stated that even if the requested documents were made available and even if the requested information was provided, and even if all of the requested interviews were conducted, those requests still would not represent a comprehensive list of all of the documents, interviews, and information required for conclusion of Ironshore's investigation of the Ironshore Claim.

58.     At no point, despite repeated requests from SPM CS, did Ironshore provide a comprehensive list of everything it believed SPM CS would need to provide in order to conclude the investigation, and make a determination on whether coverage would be paid out on the Ironshore Claim.

## FIRST CAUSE OF ACTION
### (Breach of Contract)

59.     SPM CS incorporates by reference the allegations in the previous paragraphs.

60.     The Ironshore Policy constitutes a valid and enforceable contract between Ironshore and SPM CS.

61.     SPM CS is the First Named Insured under the Travelers Policy, and therefore under the Ironshore Policy.

62.     SPM Global is an Additional Insured under the Travelers Policy, and therefore under the Ironshore Policy.

63.     SPM CS has paid all premiums, provided prompt notice of the Ironshore Claim, and otherwise performed all conditions precedent and other obligations required of it under both the Travelers Policy and Ironshore Policy.

64.     Under the terms of the Ironshore Policy, Ironshore must pay up to $9,500,000 for a direct loss of Money that comes within the Travelers Policy definitions of Employee Theft and Employee Theft of Client Property.

65.     As detailed above, the facts of the Ironshore Claim trigger coverage under the terms of the Ironshore Policy.

66.     Ironshore has refused to make a determination on coverage of the Ironshore Claim, and, as such, has failed and refused to pay to SPM CS the insurance benefits to which they are entitled under the Ironshore Policy.

67.     By failing to provide a determination for coverage for the Ironshore Claim, Ironshore has breached the terms of the Ironshore Policy.

68.     As a direct and proximate result of Ironshore's material breach of the Ironshore Policy, SPM CS has suffered and will continue to suffer harm and monetary damages amounting to millions of dollars.

## SECOND CAUSE OF ACTION
### (Insurance Bad Faith Pursuant to 42 Pa.C.S. § 8371)

69.     SPM CS incorporates by reference the allegations in the previous paragraphs.

70.     Throughout the investigation into the Ironshore Claim, Ironshore continually requested additional irrelevant and unnecessary information that plainly fell outside the scope of the Ironshore Claim, including, but not limited to, all communications with Travelers concerning the Travelers Claim and interviews with every employee with whom Lim regularly interacted irrespective of their knowledge of Lim's theft.

71.     Despite receiving the Proof of Loss, an extensive and detailed spreadsheet cataloging each of the Unauthorized Transactions with supporting documentation, and various other corporate documents, Ironshore has refused to even provide guidance on the availability of coverage under the Ironshore Policy.

72.     By engaged in the above described actions, Ironshore intentionally and materially breached its obligations and duties arising under the Ironshore Policy and have willfully and maliciously engaged in a pattern of conduct designed to delay and deny payment of insurance benefits which are justifiably due under the Ironshore Policy.

73.     Ironshore's conduct constitutes bad faith under, pursuant to, and as defined by 42 Pa.C.S. § 8371, thereby entitling SPM CS to an award of damages, including punitive damages, interest, and attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, SPM CS respectfully requests that this Court:

A.     Enter Judgment in favor of SPM CS on all claims set forth above;

B.     Award SPM CS damages (including, but not limited to, expectation damages, consequential damages, and punitive damages) in an amount to be determined against Ironshore;

C.     Award SPM CS costs in this action, including attorneys' fees, costs, and expenses pursuant to 42 Pa.C.S. § 8371; and

D.     Award SPM CS such further damages and equitable relief as the Court deems just and proper.

Respectfully submitted,

SPM CORPORATE SERVICES LLC,

By its attorneys,


/s/ Hyun Yoon
Hyun Yoon (ID No. 323706)
Buchanan Ingersoll & Rooney PC
Two Liberty Place
50 South 16th Street, Suite 3200
Philadelphia, PA  19102
(215) 665-8700
eric.yoon@bipc.com


Timothy J. Fazio (BBO #654157)
[*pro hac vice* to be filed]
Katharine K. Foote (BBO #694104)
[*pro hac vice* to be filed]
Hunton Andrews Kurth LLP
125 High Street, Suite 533
Boston, MA 02110
Tel: (617) 648-2800
tfazio@huntonak.com
kfoote@huntonak.com

Dated: June 8, 2018

# EXHIBIT A



**January 22, 2016**

**SPM CORPORATE SERVICES, LLC**
**2501 SEAPORT DRIVE**
**CHESTER, PA 19013**

Re: Important Information about **Claims Information Line**

Dear   **SPM CORPORATE SERVICES, LLC**

Travelers Bond & Specialty Insurance is pleased to announce its **1-800-842-8496** Claims Information Line.  This line is designed to provide insureds with an additional resource on how to report claims or those circumstances or events which may become claims.

Policyholders will be able to obtain assistance on the following topics from the Claims Information Line:

·The information that needs to be included with the claim notice

·The address, electronic mail address and/or facsimile number to which the policyholder can send claims related information

· Get questions on the claim process answered

The Declarations Page of your policy sets forth where you should report claims and claims related information.  You should also review the policy's reporting requirements to be aware of how much time you have to report a claim to Travelers.  The sooner Travelers is notified, the sooner we can become involved in the process and offer assistance to our policyholder.  A delay in reporting may result in all or part of a matter to fall outside of the coverage provided.

The Claims Information Line should streamline the claim reporting process and allow policyholders to ask questions on what information is needed as well as other questions which will assist them in working with Travelers.  While the Claims Information Line provides policyholders a valuable resource by answering questions and providing information, the line does not replace the reporting requirements contained in the Policy.

We hope this improvement to customer service is something our policyholders will find helps them understand the claim process and provides them a resource for reporting.

Best regards,

**Alan R Bond**

---

LTR-4035 Ed. 06-09  Printed in U.S.A.                                                Page 1 of 1
©2009 The Travelers Companies, Inc. All Rights Reserved



**One Tower Square**
**Hartford, CT 06183**

**01/22/2016**

**SPM CORPORATE SERVICES, LLC**
**2501 SEAPORT DRIVE**
**CHESTER, PA 19013**

**RE: Risk Management PLUS+ Online® from Travelers Bond & Specialty Insurance** (www.rmplusonline.com)

Travelers Bond & Specialty Insurance is pleased to provide you with Risk Management PLUS+ Online, the industry's most comprehensive program for mitigating your management liability and crime exposures related to:

- Employment practices risks
- Employee Pension and Benefit Plan Fiduciary Liability
- Directors & Officers Liability
- Employee dishonesty and other crime related risks
- Kidnap and Ransom
- CyberRisk
- Identity Fraud Expense Reimbursement
- Professional liability

Risk Management PLUS+ Online is a flexible, comprehensive loss prevention program specifically designed for Travelers Bond & Specialty Insurance customers and is available to you at no additional cost. Included in the site is a library of articles, checklists and training on relevant risk mitigation, employment and management topics.

Risk Management PLUS+ Online is a full-featured knowledge base developed to aid you in more than just protection against lawsuits, but as a great resource for HR administrators, managers and executives as well. Browse from the Quick Links or News & Information sections.  Share industry articles with managers and executive leaders to help develop ideas to increase workplace productivity, solutions for business issues and more!

**Highlights of Risk Management PLUS+ Online services include:**
- Web-based training for executives, managers and human resource personnel
- Practical solutions for problems faced in the workplace and managing your organization
- Topical webinars and weekly articles on current issues
- Model Employee Handbook, including policies and forms for downloading or printing that reduce risks in the workplace

The attached Risk Management PLUS+ Online Registration Instructions contain easy, step-by-step instructions to register for this valuable tool. For more information, call 1-888-712-7667 and ask for your Risk Management PLUS+ Online representative. It's that simple.

We strongly encourage you to take full advantage of this program to improve your organization.

Thank you for choosing Travelers Bond & Specialty Insurance for your insurance needs. Travelers is a market leader in providing management liability and crime coverages that are specifically customized for your organization.  As your risks evolve, so do we, through our ability to provide you with responsive risk management services.

Instructions for Registration & Orientation to Risk Management PLUS+ Online®

*Registration for Site Administrators:*
The Site Administrator is the person in your organization who will oversee Risk Management PLUS+ Online for the organization. The Site Administrator is typically a person who leads human resources and/or financial functions or is responsible for legal matters pertaining to personnel. The Site Administrator may add other Site Administrators later to assist with their responsibilities. To register:

1. Go to www.rmplusonline.com.
2. In the Sign-In box, click **Register**.
3. Enter the password/passcode: TRVP110000
4. Fill in the Registration Information and click **Submit**.
5. Your organization is registered, and you are registered as Site Administrator.

*Learning to Navigate the Site:*
1. Go to www.rmplusonline.com. On each page, you will see a box outlined in blue that contains the instructions for use of that page.
2. If you have any questions, just click on **Contact Us** on the front page. Enter your question in the form provided, and the System Administrator will get back to you quickly with the answer.
3. You can also schedule a live walk-through of the site by sending a request for a walk-through via the contact link on the front page.

## IMPORTANT NOTICE REGARDING INDEPENDENT AGENT AND BROKER COMPENSATION

For information on how Travelers compensates independent agents, brokers, or other insurance producers, please visit this website: www.travelers.com/w3c/legal/Producer_Compensation_Disclosure.html

If you prefer, you can call the following toll-free number: 1-866-904-8348. Or you can write to us at Travelers, Agency Compensation, One Tower Square, Hartford, CT 06183.

© 2015 The Travelers Indemnity Company. All rights reserved.

# PENNSYLVANIA NOTICE

An insurance company, its agents, employees, or service contractors acting on its behalf, may provide services to reduce the likelihood of injury, death or loss.  These services may include any of the following or related services incident to the application for issuance, renewal or continuation of a policy of insurance:

1.  Surveys; or

2.  Consultation or advice; or

3.   Inspections.

The "Insurance Consultation Services Exemption Act" of Pennsylvania provides that the Insurance Company, its agents, employees or service contractors acting on its behalf, are not liable for  **Damages**  from injury, death or loss occurring as a result of any act of omission by any person in the furnishing of or the failure to furnish these services.

The Act does not apply:

1.   If the injury, death or loss occurred during the actual performance of the services and was caused by the negligence of the Insurance Company, its agents, employees or service contractors; or

2.  To consultation services required to be performed under a written service contract not related to a policy of insurance; or

3.  If any acts or omissions of the Insurance Company, its agents, employees or service contractors are judicially determined to constitute a crime, actual malice, or gross negligence.

©2009 The Travelers Companies, Inc. All Rights Reserved





*CRIME*
*DECLARATIONS*

POLICY NO. **106446911**

**Travelers Casualty and Surety Company of America**
**Hartford, Connecticut**
(A Stock Insurance Company, herein called the Company)

| | |
|---|---|
| **ITEM 1** | **NAMED INSURED:**<br><br>**SPM CORPORATE SERVICES, LLC**<br><br>D/B/A:<br><br><br>Principal Address:<br>**2501 SEAPORT DRIVE**<br>**CHESTER, PA 19013** |
| **ITEM 2** | **POLICY PERIOD:**<br><br>Inception Date: **February 22, 2016**        Expiration Date: **February 22, 2017**<br>12:01 A.M. standard time both dates at the Principal Address stated in ITEM 1. |
| **ITEM 3** | **ALL NOTICES OF CLAIM OR LOSS MUST BE SENT TO THE COMPANY BY EMAIL, FACSIMILE, OR MAIL AS SET FORTH BELOW:**<br><br>**Email:BSIclaims@travelers.com**<br>**FAX:(888) 460-6622**<br><br>**Mail:Travelers Bond & Specialty Insurance Claim**<br>        **385 Washington St. – Mail Code 9275-NB03F**<br>        **St Paul, MN  55102** |
| **ITEM 4** | **COVERAGE INCLUDED AS OF THE INCEPTION DATE IN ITEM 2:**<br><br>Crime |

| ITEM 5 | CRIME | | |
|---|---|---|---|
| | **Insuring Agreement** | **Single Loss Limit of Insurance** | **Single Loss Retention** |
| | **A. Fidelity** | | |
| | 1. Employee Theft | **$500,000** | **$10,000** |
| | 2. ERISA Fidelity | **$500,000** | **$0** |
| | 3. Employee Theft of Client Property | **$500,000** | **$10,000** |
| | **B. Forgery or Alteration** | **$500,000** | **$10,000** |
| | **C. On Premises** | **Not Covered** | |
| | **D. In Transit** | **Not Covered** | |
| | **E. Money Orders and Counterfeit Money** | **$500,000** | **$10,000** |
| | **F. Computer Crime** | | |
| | 1. Computer Fraud | **$500,000** | **$10,000** |
| | 2. Computer Program and Electronic Data Restoration Expense | **Not Covered** | |
| | **G. Funds Transfer Fraud** | **$500,000** | **$10,000** |
| | **H. Personal Accounts Protection** | | |
| | 1. Personal Accounts Forgery or Alteration | **Not Covered** | |
| | 2. Identity Fraud Expense Reimbursement | **Not Covered** | |
| | **I. Claim Expense** | **$5,000** | **$0** |

| | |
|---|---|
| **ITEM 5. (Cont'd)** | If "*Not Covered*" is inserted above opposite any specified Insuring Agreement, or if no amount is included in the Limit of Insurance, such Insuring Agreement and any other reference thereto is deemed to be deleted from this **Crime Policy**.<br><br>**Policy Aggregate Limit of Insurance:**  ☐ Applicable   ☒ Not Applicable<br><br>If a Policy Aggregate Limit of Insurance is applicable, then the Policy Aggregate Limit of Insurance for each **Policy Period** for Insuring Agreements A through H, inclusive, is:   **Not Applicable**<br>If a Policy Aggregate Limit of  Insurance is not included, then this **Crime Policy**  is not subject to a Policy Aggregate Limit of Insurance as  set forth in Section V. CONDITIONS B. PROVISIONS AFFECTING LOSS ADJUSTMENT AND  SETTLEMENT 1. Limit of Insurance  a. Policy Aggregate Limit of Insurance.<br><br>**Cancellation of Prior Insurance:**<br>By acceptance of this **Crime Policy**, the **Insured** gives the Company notice canceling prior policies or bonds issued by the Company that are designated by policy or bond numbers **Not Applicable,**<br>such cancellation to be effective at the time this **Crime Policy** becomes effective.<br><br>**INSURED'S PREMISES COVERED:**<br><br>All Premises of the Insured in the United States of America, its territories and possessions, Canada, or any other country throughout the world, except:<br><br>**Not Applicable** |
| **ITEM 6** | **PREMIUM FOR THE POLICY PERIOD:**<br><br>**$3,523.00**     Policy Premium<br><br>**N/A**     Annual Installment Premium |
| **ITEM 7** | **FORMS AND ENDORSEMENTS ATTACHED AT ISSUANCE:**<br>**ACF-7006-0511; CRI-3001-0109; CRI-19060-0713; CRI-19072-0315; CRI-19076-0116; CRI-4018-0109; CRI-7021-0109; CRI-7028-0109; CRI-5039-0613** |

©2009 The Travelers Companies, Inc. All Rights Reserved

**THE DECLARATIONS, THE APPLICATION, THE CRIME TERMS AND CONDITIONS, ANY PURCHASED INSURING AGREEMENTS, AND ANY ENDORSEMENTS ATTACHED THERETO, CONSTITUTE THE ENTIRE AGREEMENT BETWEEN THE COMPANY AND THE NAMED INSURED.**

_____
Countersigned By

IN WITNESS WHEREOF, the Company has caused this policy to be signed by its authorized officers.

Executive Vice President                                    Corporate Secretary

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## REMOVAL OF SHORT-RATE CANCELLATION ENDORSEMENT

This endorsement changes the following:
**Crime**

**It is agreed that:**

In any cancellation, termination or non-renewal provision, any reference to computing a premium on a short rate basis is replaced with a reference to computing such premium on a pro-rata basis.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**

Policy Number: **106446911**

© 2011 The Travelers Indemnity Company. All rights reserved.



<div align="right">***CRIME***</div>

<div align="center">

***CRIME TERMS AND CONDITIONS***

***PLEASE READ ALL TERMS AND CONDITIONS CAREFULLY***

</div>

**CONSIDERATION CLAUSE**

**IN CONSIDERATION** of the payment of the premium stated in the Declarations, and subject to the Declarations and pursuant to all the terms, conditions, exclusions and limitations of this **Crime Policy**, the Company will pay the **Insured** for direct loss that the **Insured** sustains which is directly caused by a **Single Loss** taking place at any time and which is **Discovered** by the **Insured** during the **Policy Period** or during the Extended Period to Discover Loss pursuant to the terms set forth in Section V. CONDITIONS A. GENERAL CONDITIONS 3. Extended Period to Discover Loss.

---

*I.*       *INSURING AGREEMENTS*

---

This **Crime Policy** provides coverage under each of the following Insuring Agreements. Notwithstanding the aforesaid, if ITEM 5 of the Declarations indicates that any Insuring Agreement is "*Not Covered,*" then such Insuring Agreement and any other reference thereto is deemed to be deleted from this **Crime Policy**.

     **A.**     **FIDELITY**

          1.     Employee Theft

          The Company will pay the **Insured** for the **Insured's** direct loss of, or direct loss from damage to, **Money**, **Securities** and **Other Property** directly caused by **Theft** or **Forgery** committed by an **Employee**, whether identified or not, acting alone or in collusion with other persons.

          2.     ERISA Fidelity

          The Company will pay the **Insured** for direct loss of, or direct loss from damage to, **Money**, **Securities** and **Other Property** that belongs to an **Employee Benefit Plan**, directly caused by **Theft** or **Forgery** committed by a **Fiduciary**, whether identified or not, acting alone or in collusion with other persons.

          3.     Employee Theft of Client Property

          The Company will pay the **Insured** for direct loss of, or direct loss from damage to, **Money**, **Securities** and **Other Property** sustained by the **Insured's Client**, directly caused by **Theft** or **Forgery** committed by an identified **Employee**.

     **B.**     **FORGERY OR ALTERATION**

          The Company will:

          1.     pay the **Insured** for the **Insured's** direct loss directly caused by **Forgery** or alteration of, on or in any written **Covered Instruments** that are:

---

©2009 The Travelers Companies, Inc. All Rights Reserved

a.     made by, drawn by, or drawn upon, the **Insured**, or purport to have been so made or drawn; or

b.     made or drawn by one acting as the **Insured's** agent, or purport to have been so made or drawn; and

2.     reimburse the **Insured** for reasonable legal defense expenses that the **Insured** has paid if the **Insured** is sued for refusing to pay any written **Covered Instrument** under this Insuring Agreement B. on the basis that it has been **Forged** or altered. Reimbursement of such legal expenses is conditioned upon the **Insured's** receipt of the Company's prior written consent to defend against such suit. The amount of any legal expenses reimbursed under Insuring Agreement B. is in addition to the applicable Single Loss Limit of Insurance for Insuring Agreement B.

A signature that is a mechanical or electronic reproduction of a handwritten signature produced by a mechanical check-writing machine or a computer printer is treated the same as a handwritten signature. An **Electronic Signature** is not treated the same as a mechanical or electronic reproduction of a handwritten signature and is not a **Forgery** under this Insuring Agreement B.

For purposes of this Insuring Agreement B., the term "check" includes a "substitute check" as defined in the Check Clearing for the 21st Century Act, and will be treated the same as the original it replaced.

## C.     ON PREMISES

The Company will pay the **Insured** for:

1.     the **Insured's** direct loss of **Money** or **Securities** located inside the **Premises** or **Financial Institution Premises** directly caused by **Theft**, committed by a person present inside such **Premises** or **Financial Institution Premises**;

2.     the **Insured's** direct loss of **Money** or **Securities** located inside the **Premises** or **Financial Institution Premises** directly caused by disappearance, damage or destruction;

3.     the **Insured's** direct loss of, or direct loss from damage to, **Other Property** located inside the **Premises**:
        a.     directly caused by an actual or attempted **Robbery**; or
        b.     in a safe or vault, directly caused by an actual or attempted **Safe Burglary**; and

4.     the **Insured's** direct loss from damage to the **Premises** or its exterior resulting directly from an actual or attempted **Theft**, **Robbery** or **Safe Burglary**, if the **Insured** is the owner of the **Premises** or is liable for damage to it; or

5.     the **Insured's** direct loss of, or loss from damage to, a locked safe, vault, cash register, cash box or cash drawer located inside the **Premises** resulting directly from an actual or attempted **Theft**, **Robbery** or **Safe Burglary**, if the **Insured** is the owner of the locked safe, vault, cash register, cash box or cash drawer or is liable for damage thereto.

## D.     IN TRANSIT

1.     The Company will pay the **Insured** for the **Insured's** direct loss of **Money** or **Securities** directly caused by **Theft**, disappearance, damage or destruction while in transit outside the **Premises** and in the care and custody of:

a.   **a Messenger**, including while temporarily within the living quarters of a **Messenger**; or

b.   an armored motor vehicle company.

2.   The Company will pay the **Insured** for the **Insured's** direct loss of, or the **Insured's** direct loss from damage to, the **Insured's Other Property** directly caused by an actual or attempted **Robbery** while in transit outside the **Premises** and in the care and custody of:

a.   **a Messenger**; or

b.   an armored motor vehicle company.

3.   The Company will pay the **Insured** for the **Insured's** direct loss of, or direct loss from damage to, the **Insured's Other Property** directly caused by an actual or attempted **Theft** of the **Insured's Other Property** while it is temporarily within the living quarters of a **Messenger**.

Coverage under this Insuring Agreement D. begins immediately upon receipt of the **Money**, **Securities** or **Other Property** by the transporting party and ends immediately upon delivery to the designated recipient or its agent.

E.   **MONEY ORDERS AND COUNTERFEIT MONEY**

The Company will pay the **Insured** for the **Insured's** direct loss directly caused by the **Insured's** good faith acceptance of:

1.   original money orders, issued or purportedly issued by any post office, express company or bank located in the United States of America, its territories and possessions, Canada, or any other country in which the **Insured** maintains a physical **Premises**, that are not paid upon presentation; or

2.   **Counterfeit Money**, of the United States of America, its territories and possessions, Canada, or any other country in which the **Insured** maintains a physical **Premises** that is acquired during the regular course of business;

in exchange for merchandise, **Money** or services.

F.   **COMPUTER CRIME**

1.   Computer Fraud

The Company will pay the **Insured** for the **Insured's** direct loss of, or direct loss from damage to, **Money**, **Securities** and **Other Property** directly caused by **Computer Fraud**.

2.   Computer Program and Electronic Data Restoration Expense

The Company will pay the **Insured** for reasonable **Restoration Expense** that the **Insured** incurs to restore or replace damaged or destroyed **Computer Programs** or **Electronic Data** stored within the **Insured's Computer System** directly caused by a **Computer Violation**.

For purposes of this Insuring Agreement F.2., a **Single Loss** involving **Computer Program** and **Electronic Data Restoration Expense** applies to reasonable **Restoration Expense** incurred by the **Insured** between the time the **Insured Discovers** the damage or destruction and the time the

**Insured's Computer Program** or **Electronic Data** is restored to the level of operational capability that existed immediately preceding a **Computer Violation**. Recurrence of the same **Computer Virus** after the **Insured's Computer Program** or **Electronic Data** has been restored constitutes a separate **Single Loss**.

Payment of reasonable **Restoration Expense** applies:

a. only to **Computer Programs** and **Electronic Data** which the **Insured** owns or leases, or for which the **Insured** is legally liable; and

b. only if the **Insured** is unable to reproduce such **Computer Programs** or **Electronic Data** from back-up data copies.

Payment of reasonable **Restoration Expense** will be made to the **Insured** upon the completion of the restoration of the damaged or destroyed **Computer Programs** or **Electronic Data**.

If a **Single Loss** is covered under both Insuring Agreements F.1. and F.2., then only the Retention for a **Single Loss** under Insuring Agreement F.1. will be applicable and the payment of **Restoration Expense** under Insuring Agreement F.2. will be part of, and not in addition to, the Single Loss Limit of Insurance for Insuring Agreement F.1.

**G. FUNDS TRANSFER FRAUD**

The Company will pay the **Insured** for the **Insured's** direct loss of **Money** and **Securities** contained in the **Insured's Transfer Account** directly caused by **Funds Transfer Fraud**.

**H. PERSONAL ACCOUNTS PROTECTION**

1. Personal Accounts Forgery or Alteration

The Company will pay the **Insured**, on behalf of the **Insured's Management Staff Member**, for loss incurred by the **Insured's Management Staff Member**, directly caused by **Forgery** or alteration of, on or in any written **Covered Personal Instruments** that are:

a. drawn upon personal accounts of the **Insured's Management Staff Membe**r, or purported to have been so drawn; or

b. made or drawn by one acting as an agent of the **Insured's Management Staff Member**, or purport to have been so made or drawn.

A signature that is a mechanical or electronic reproduction of a handwritten signature produced by a mechanical check-writing machine or a computer printer will be treated the same as a handwritten signature. An **Electronic Signature** is not treated the same as a mechanical or electronic reproduction of a handwritten signature and is not a **Forgery** under this Insuring Agreement H.

For purposes of this Insuring Agreement H.1. the term "check" includes a substitute check as defined in the Check Clearing for the 21st Century Act, and will be treated the same as the original it replaced.

2. Identity Fraud Expense Reimbursement

The Company will reimburse the **Insured**, on behalf of the **Insured's Management Staff Member**, for **Identity Fraud Expense** incurred by the **Insured's Management Staff Member** as a direct result of any **Identity Fraud**.

©2009 The Travelers Companies, Inc. All Rights Reserved

**I.        CLAIM EXPENSE**

The Company will pay the **Insured** for reasonable **Claim Expenses** incurred and paid by the **Insured** to establish the existence, amount and preparation of the **Insured's** proof of loss in support of a covered claim for loss under any Insuring Agreement of this **Crime Policy**.

The following conditions specifically apply to this Insuring Agreement I.:

1.    any **Claim Expenses** payable to the **Insured** are only applicable to any covered loss which exceeds the Single Loss Retention for the Insuring Agreement that is the subject of a claim under this **Crime Policy**;

2.    **Claim Expenses** that are payable to the **Insured** are in addition to the Single Loss Limit of Insurance for the Insuring Agreement that is the subject of a claim under this **Crime Policy**; and

3.    **Claim Expenses** payable to the **Insured** will be paid to the **Insured** at the same time as the payment of the valid and collectible loss under the Insuring Agreement that is the subject of a claim under this **Crime Policy**.

---

*II.       GENERAL AGREEMENTS*

**A.     JOINT INSURED**

1.    If the **Insured** consists of more than one entity, then the **First Named Insured** acts for itself and for every other **Insured** for all purposes of this **Crime Policy**.

2.    If any **Insured**, or a partner or **Management Staff Member** of that **Insured**, has knowledge of any information relevant to this **Crime Policy**, that knowledge is considered knowledge of every **Insured**.

3.    An **Employee** of any **Insured** is considered to be an **Employee** of every **Insured**.

4.    The Company will not pay the **Insured** more for loss or losses sustained by more than one **Insured** than the amount the Company would pay if all loss or losses had been sustained by one **Insured**.

5.    Payment by the Company to the **First Named Insured** for loss sustained by any **Insured**, or payment by the Company to the **Employee Benefit Plan** for loss sustained under Insuring Agreement A.2, fully releases the Company on account of such loss.

6.    If this **Crime Policy** or any of its Insuring Agreements are canceled or terminated as to any **Insured**, loss sustained by that **Insured** is covered only if **Discovered** by the **Insured** during the period of time provided in the Extended Period To Discover Loss pursuant to the terms set forth in Section V. CONDITIONS A. GENERAL CONDITIONS 3. Extended Period to Discover Loss; provided, this extended period to discover loss terminates as to that **Insured** immediately upon the effective date of any other insurance obtained by that **Insured** replacing in whole or in part the insurance afforded by this **Crime Policy**, whether or not such other insurance provides coverage for loss sustained prior to its effective date.

**B.     ADDITIONAL OFFICES**

If the **Insured** establishes any additional offices, other than by consolidation with, merger with, purchase of, or acquisition of assets or liabilities of another organization while this **Crime Policy** is in effect, such offices are automatically covered by this **Crime Policy** from the date of such establishment without the requirement of notice to the Company or the payment of additional premium for the remainder of the **Policy Period**.

C.    **CONSOLIDATION, MERGER OR PURCHASE OF ASSETS**

If, during the **Policy Period**, the **Insured** merges with, purchases or acquires the assets or liabilities of another entity, this **Crime Policy** will provide coverage for that merged, purchased, or acquired entity, subject to all other terms and conditions herein, but only for loss **Discovered** by the **Insured** after the effective date of such merger, purchase, or acquisition; provided, the **Insured** gives the Company written notice of such merger, purchase, or acquisition, and specific application has been submitted on the Company's form in use at the time, together with such documentation and information as the Company may require, all within 90 days after the effective date of such merger, purchase, or acquisition. Coverage for the merged, purchased, or acquired entity will not be afforded following such 90-day period unless the Company has agreed to provide such coverage, subject to any additional terms and conditions as the Company may require, and the **Insured** has paid the Company any additional premium as may be required by the Company. Any **Employee Benefit Plan** or **Sponsored Plan** acquired as above will be included as **Insureds** as specified in Item 1 of the Declarations.

The 90-day notice requirement and the 90-day limitation of coverage will not apply, provided: (1) the assets of the merged, purchased, or acquired entity do not exceed 30% of the total assets of all **Insureds** as reflected in the **Insured's** most recent fiscal year-end financial statement, or (2) the merger, purchase, or acquisition occurs less than 90 days prior to the end of the **Policy Period**.

D.    **ACQUISITIONS**

If, during the **Policy Period**, the **Insured** acquires a **Subsidiary**, this **Crime Policy** will provide coverage for such **Subsidiary** and its respective **Management Staff Members**, **Employee Benefit Plans**, and **Sponsored Plans**, subject to all other terms and conditions of this **Crime Policy**, provided written notice of such acquisition has been given to the Company, and specific application has been submitted on the Company's form in use at the time, together with such documentation and information as the Company may require, all within 90 days after the effective date of such acquisition.  Coverage for such **Subsidiary** will not be afforded following such 90-day period unless the Company has agreed to provide such coverage, subject to any additional terms and conditions as the Company may require, and the **Insured** has paid the Company any additional premium as may be required by the Company.

The 90-day notice requirement and the 90-day limitation of coverage will not apply provided that: (1) the assets of the acquired **Subsidiary** do not exceed 30% of the **Insured's** total assets as reflected in the **Insured's** most recent fiscal year-end financial statement; or (2) the acquisition occurs less than 90 days prior to the end of the **Policy Period**.

E.    **CHANGE OF CONTROL – NOTICE REQUIREMENTS**

When the **Insured** learns that a **Change of Control** has taken place as to any **Insured**, or will take place during the **Policy Period**, the **Insured** must give the Company written notice within 90 days of the effective date of such **Change of Control**.

---

_III._    _**DEFINITIONS**_

---

Wherever appearing in this **Crime Policy**, the following words and phrases appearing in bold type have the meanings set forth in this Section III. DEFINITIONS:

A.    _**Change of Control**_ means:

1.    the acquisition of any **Insured**, or of all or substantially all of its assets, by another entity, or the merger or consolidation of any **Insured** into or with another entity such that the **Insured** is not the surviving entity; or

2.    the obtaining by any person, entity or affiliated group of persons or entities of the right to elect, appoint or designate more than 50% of the board of directors or board of managers or to exercise a majority control of the board of directors, board of managers, or a functional equivalent thereof of any **Insured**.

B.     *Claim Expenses* means reasonable fees, costs and expenses of outside accountants, attorneys, consultants or experts retained by the **Insured** to determine the amount and extent of loss covered under this **Crime Policy**. The reasonableness of such expenses will be determined by the Company. The phrase does not mean or include any of the **Insured's** internal corporate fees, costs (direct or indirect), obligations or **Employee** wages and salaries.

C.     *Client* means an entity designated as a **Client** by endorsement to this **Crime Policy** for which the **Insured** performs services as specified in a written agreement, but only while the written agreement is in effect.

D.     *Client's Premises* means the interior of that portion of any building the **Insured's Client** occupies in conducting its business.

E.     *Computer Fraud* means:

The use of any computer to fraudulently cause a transfer of **Money**, **Securities** or **Other Property** from inside the **Premises** or **Financial Institution Premises**:

1.     to a person (other than a **Messenger**) outside the **Premises** or **Financial Institution Premises**; or

2.     to a place outside the **Premises** or **Financial Institution Premises**.

F.     *Computer Program* means a set of related electronic instructions that direct the operations and functions of a **Computer System** or devices connected to it that enable the **Computer System** or devices to receive, process, store, retrieve, send, create or otherwise act upon **Electronic Data**.

G.     *Computer System* means a computer and all input, output, processing, storage and communication facilities and equipment that are connected to such a device and that the operating system or application software used by the **Insured** are under the direct operational control of the **Insured**. Off-line media libraries are deemed to be part of such **Computer System**.

H.     *Computer Violation* means:

1.     a **Computer Virus** designed to damage or destroy a **Computer Program** or **Electronic Data**; or

2.     vandalism by a natural person, including an **Employee**, who has gained unauthorized electronic access to the **Insured's Computer System**.

I.     *Computer Virus* means a set of unauthorized instructions, programmatic or otherwise:

1.     directed solely against the **Insured**; and

2.     that propagate themselves through the **Computer System** or networks;

provided such instructions were maliciously introduced by a natural person.

J.     *Counterfeit* means an imitation of **Money** that is intended to deceive and to be taken as genuine.

K.     *Covered Instruments* means:

1.     checks, drafts, promissory notes, bills of exchange or similar written promises, orders or directions to pay a sum certain in **Money**; and

2.     written instruments required in conjunction with any transaction involving any **Credit, Debit or Charge Card** issued to the **Insured**, the **Insured's Employees** or the **Insured's Management Staff Members** for business purposes.

L.     *Covered Personal Instruments* means:

1.     checks, drafts, promissory notes or similar written promises, orders or directions to pay a sum certain in **Money**; and

2. written instruments required in conjunction with any transaction involving any **Credit, Debit or Charge Card** issued to a **Management Staff Member** for personal use.

M. ***Credit, Debit or Charge Card*** means any card, plate or other similar device used for the purpose of obtaining **Money**, property, labor or services on credit or for immediate payment. The terms do not mean a note, check, draft, money order or other negotiable instrument.

N. ***Crime Policy*** means, collectively, the Declarations, the application, the Crime Terms and Conditions, and any endorsements attached thereto.

O. ***Digital Signature*** means an electronic identifier created by computer, within, attached to or logically associated with a record and executed or adopted by a person with the intent to sign the record.

P. ***Discover, Discovered,*** or ***Discovery*** means the moment when the **Insured**, any partner in the **Insured**, or **Management Staff Member**:

1. first become(s) aware of facts that would cause a reasonable person to assume that a loss of a type covered by this **Crime Policy** has been or will be incurred, regardless of when the act or acts causing or contributing to such loss occurred, even though the exact details of loss may not then be known; or
2. first receive(s) notice of a claim against the **Insured** alleging facts which, if true, would constitute a loss under this **Crime Policy**,

whichever occurs first.

Q. ***Electronic Data*** means facts or information converted to a form:

1. usable in a **Computer System**;
2. that does not provide instructions or directions to a **Computer System**; or
3. that is stored on electronic processing media for use by a **Computer Program**.

R. ***Electronic Signature*** means a **Digital Signature**, an electronic sound, symbol or process, within, attached to, or logically associated with a record and executed or adopted by a person with the intent to sign the record.

S. ***Employee*** means:

1. any natural person:

   a. while in the **Insured's** service or for 60 days after termination of service, unless such termination is due to **Theft** or **Forgery** or any other dishonest act committed by the **Employee**;
   b. who the **Insured** compensates directly by salary, wages or commissions; and
   c. who the **Insured** has the right to direct and control while performing services for the **Insured**;

2. any natural person who is temporarily furnished to the **Insured**:

   a. to substitute for an **Employee** as set forth in paragraph 1. above, who is on medical, military or other leave of absence; or
   b. to meet seasonal or short-term workload conditions;

   while that person is subject to the **Insured's** direction and control and performing services for the **Insured**; provided, any such natural person who has care and custody of property outside the **Premises** is specifically excluded from this definition;

---

©2009 The Travelers Companies, Inc. All Rights Reserved

3.   any natural person, other than a temporary **Employee** described in paragraph 2. above, who is leased to the **Insured** under a written agreement between the **Insured** and a labor leasing firm, while that person is subject to the **Insured's** direction and control and performing services for the **Insured**;

4.   any natural person:

   a.   who is a member of the board of directors, member of the board of trustees or **LLC Manager** while acting as a member of any of the **Insured's** elected or appointed committees, including any member of such committee, to perform on the **Insured's** behalf, specific, as distinguished from general, directorial acts;

   b.   who is a non-compensated officer;

   c.   other than a non-compensated fund solicitor, while performing services for the **Insured** that are usual to the duties of an **Employee** or officer;

   d.   while acting as a non-compensated fund solicitor during fund raising campaigns;

   e.   who is a former **Employee**, member of the board of directors, partner, **LLC Manager**, or member of the board of trustees retained as a consultant while that person is subject to the **Insured's** direction and control and performing services for the **Insured**;

   f.   who is a guest student or intern pursuing studies or duties in any of the **Insured's** offices or **Premises**; while such person is subject to the **Insured's** direction and control and performing services for the **Insured**;

   g.   who is a volunteer, while such person is subject to the **Insured's** direction and control and is performing services for the **Insured**, or

5.   any attorney retained by the **Insured**, and any employee of such attorney, while performing legal services for the **Insured**.

*Employee* also means any individual described in paragraphs 1-5 above while such person is on medical, military, or other leave of absence from the **Insured**. Coverage applies to any such **Employee** while on leave, regardless of whether such person remains subject to the **Insured's** direction and control during the time of leave.

*Employee* does not mean any agent, broker, factor, commission merchant, consignee, independent contractor or representative or other person of the same general character not specified in paragraphs 1. through 5. above.

T.   *Employee Benefit Plan* means an employee welfare benefit plan or an employee pension benefit plan as more fully set forth in Title 1, Section 3 of the Employee Retirement Income Security Act of 1974 and any amendments thereto (ERISA) and which is solely sponsored by an **Employee Benefit Plan Sponsor**.

U.   **Employee Benefit Plan Sponsor** means:

1.   the **First Named Insured**,

2.   any **Subsidiary**, or

3.   any other entity listed in Item 1. of the Declarations.

V.   *Fiduciary* means any natural person who is a trustee, an officer, an **Employee** or an administrator of any **Employee Benefit Plan**; and any person, or a member of the board of directors, an officer, an **Officer-Shareholder**, a member of the board of trustees, an **LLC Manager**, or an **Employee** while that person is handling **Money**, **Securities** and **Other Property** that belongs to any **Employee Benefit Plan**.

**Fiduciary** does not mean any agent, broker, independent contractor, broker/dealer, registered representative, investment advisor, custodian or other person or entity of the same general character.

W.   *Financial Institution* means:

    1.   a bank, trust company, savings bank, credit union, savings and loan association or similar thrift institution; or

    2.   a stock brokerage firm, mutual fund, liquid assets fund or similar investment institution.

X.   *Financial Institution Premises* means the interior of that portion of any building occupied by a **Financial Institution** (including any night depository chute and any safe maintained by such **Financial Institution**), transfer agent or registrar or similarly recognized place of safe deposit.

Y.   *First Named Insured* means the entity first named in ITEM 1 of the Declarations.

Z.   *Forgery*, or *Forged* means the signing of the name of another person or organization with a handwritten signature physically affixed directly to a **Covered Instrument** or **Covered Personal Instrument**, without authority and with the intent to deceive; it does not mean a signature that consists in whole or in part of one's own name signed with or without authority in any capacity, for any purpose.

AA.   *Funds Transfer Fraud* means:

    1.   an electronic, telegraphic, cable, teletype or telephone instruction fraudulently transmitted to a **Financial Institution** directing such institution to debit a **Transfer Account** and to transfer, pay or deliver **Money** or **Securities** from the **Transfer Account** which instruction purports to have been transmitted by the **Insured**, but was in fact fraudulently transmitted by someone other than the **Insured** without the **Insured's** knowledge or consent;

    2.   a fraudulent written instruction, other than one covered under Insuring Agreement B., issued to a **Financial Institution** directing such **Financial Institution** to debit a **Transfer Account** and to transfer, pay or deliver **Money** or **Securities** from such **Transfer Account** by use of an electronic funds transfer system at specified intervals or under specified conditions, which written instruction purports to have been issued by the **Insured** but was in fact fraudulently issued, **Forged** or altered by someone other than the **Insured** without the **Insured's** knowledge or consent; or

    3.   an electronic, telegraphic, cable, teletype, telefacsimile, telephone or written instruction initially received by the **Insured**, which purports to have been transmitted by an **Employee**, but which was in fact fraudulently transmitted by someone else without the **Insured's** or the **Employee's** consent.

BB.   *Identity Fraud* means the act of knowingly transferring or using, without lawful authority, a means of identification of a **Management Staff Member** with the intent to commit, aid, or abet any unlawful activity that constitutes a violation of federal law or a felony under any applicable jurisdiction.

CC.   *Identity Fraud Expense* means:

    1.   costs for notarizing fraud affidavits or similar documents for credit agencies, financial institutions, merchants or other credit grantors that have required that such affidavits be notarized;

    2.   costs for certified mail to law enforcement agencies, credit agencies, financial institutions, merchants or other credit grantors;

3.     costs for long distance telephone calls to law enforcement agencies, credit agencies, financial institutions, merchants or other credit grantors to report or discuss any actual **Identity Fraud**;

4.     lost wages, up to a maximum payment of $1,000. per week for a maximum period of five (5) weeks, as a result of absence from employment:

    a.     to communicate with law enforcement agencies, legal counsel, credit agencies, financial institutions, merchants or other credit grantors;

    b.     to complete fraud affidavits or similar documents; or

    c.     due to wrongful incarceration arising solely from someone having committed a crime in the **Management Staff Member's** name; provided, that lost wages will not apply in the case of wrongful incarceration absent all charges being dismissed or an acquittal;

5.     loan application fees for re-applying for a loan or loans when the original application is rejected solely because the lender received incorrect credit information;

6.     reasonable attorney fees incurred, with the Company's prior written consent, for:

    a.     defense of lawsuits brought against the **Insured's Management Staff Member** by financial institutions, merchants, other credit grantors or their collection agencies;

    b.     the removal of any criminal or civil judgments wrongly entered against the **Insured's Management Staff Member**; or

    c.     challenging the accuracy or completeness of any information in a consumer credit report; and

7.     costs for daycare and eldercare incurred solely as a direct result of any **Identity Fraud Discovered** during the **Policy Period**.

*Identity Fraud Expense* does not include any expense or loss not listed in paragraphs 1. through 7. of this Definition CC..

DD.     *Insured* means:

1.     for the purposes of Insuring Agreement A.2., any and all **Employee Benefit Plans**;

    a.     which have been established or maintained by an **Employee Benefit Plan Sponsor** as of the inception date of this **Crime Policy**, or

    b.     which have been created or acquired by an **Employee Benefit Plan Sponsor** after the inception date of this **Crime Policy**, subject to the provisions of General Agreements C and D.

or

2.     for the purposes of all other Insuring Agreements:

    a.     the **First Named Insured**,

    b.     any **Subsidiary**,

    c.     any **Sponsored Plan,** or

    d.     any other entity listed in Item 1. of the Declarations.

EE.     *LLC Manager* means any natural person who was, is or becomes a manager, member of the board of managers, or a functionally equivalent executive of a limited liability company.

FF.     *LLC Member* means any natural person who has an ownership interest in a limited liability company.

GG. **Management Staff Member** means the **Insured's** proprietor, natural person partner, member of the board of directors, member of the board of trustees, officer, risk manager, in-house general counsel, **LLC Manager**, or **LLC Member**.

HH. **Messenger** means any **Management Staff Member**, or relative thereof, any **Officer-Shareholder**, or any **Employee**, duly authorized, while having care and custody of covered property outside the **Premises**.

II. **Money** means a medium of exchange in current use and authorized or adopted by a domestic or foreign government, including currency, coins, bank notes, bullion, travelers' checks, registered checks and money orders held for sale to the public.

JJ. **Officer-Shareholder** means any officer who has a 25% or greater ownership interest in any one or more **Insureds**.

KK. **Other Property** means any tangible property other than **Money** and **Securities** that has intrinsic value.

LL. **Policy Period** means the period from the Inception Date to the Expiration Date set forth in ITEM 2 of the Declarations. In no event will the **Policy Period** continue past the effective date of cancellation or termination of this **Crime Policy**.

MM. **Premises** means the interior of that portion of any building the **Insured** occupies in conducting the **Insured's** business.

NN. **Restoration Expense** means reasonable costs incurred by the **Insured** to reproduce **Computer Programs** or **Electronic Data** and enable the **Insured** to restore the **Insured's Computer System** to the level of operational capability that existed immediately preceding a **Computer Violation**.

   **Restoration Expense** does not include:

   1. the **Insured's** internal corporate costs and expenses, including **Employee** remuneration and any costs related to any legal action;

   2. expenses incurred as a result of the reconstruction of **Computer Programs** and **Electronic Data** recorded on media, including magnetic or optical media if there are no analyses files, specifications or backups of **Computer Programs** or **Electronic Data** held outside the **Premises**;

   3. expenses incurred as a result of the reconstruction of **Computer Programs** and **Electronic Data** if the **Insured** knowingly used illegal copies of programs;

   4. expenses incurred to render the **Computer Programs** and **Electronic Data** usable by replacement processing equipment;

   5. expenses incurred to design, update or improve **Computer Programs** or **Electronic Data** or to perfect their operation or performance;

   6. expenses incurred as a result of alteration in **Computer Programs** and **Electronic Data** held on magnetic media due to the effect of magnetic fields, incorrect usage of the **Computer Programs** and **Electronic Data**, or the obsolescence of the **Computer System**;

   7. the **Insured's** lost revenue, sales or profits; or

   8. expenses incurred by any customer.

OO. **Robbery** means the unlawful taking of **Money**, **Securities** and **Other Property** from the care and custody of the **Insured**, the **Insured's** partners or any other person (except any person acting as a watchperson or janitor) by one who has:

   1. caused or threatened to cause that person bodily harm; or

   2. committed an unlawful act witnessed by that person.

PP. **Safe Burglary** means the unlawful taking of:

   1. **Money**, **Securities** and **Other Property** from within a locked safe or vault by a person unlawfully entering the safe or vault as evidenced by marks of forcible entry upon its exterior; or

2.    a safe or vault from inside the **Premises**.

QQ.    **Securities** means written negotiable and non-negotiable instruments or contracts representing **Money** or property including:

1.    tokens, tickets, revenue and other stamps (whether represented by actual stamps or unused value in a meter) in current use; and

2.    evidences of debt issued in connection with any **Credit**, **Debit or Charge Card**, which cards are not issued by the **Insured**;

but does not include **Money**.

RR.    **Single Loss** means:

1.    for purposes of Insuring Agreement A.:

a.    an individual act;

b.    the combined total of all separate acts; or

c.    a series of related acts;

committed by an **Employee** or committed by more than one **Employee** acting alone or in collusion with other persons both during and before the **Policy Period**;

2.    for purposes of Insuring Agreements B. and H.1., all loss caused by any person, or loss in which that person is involved, whether the loss involves one or more written **Covered Instruments** or **Covered Personal Instruments**; and

3.    for purposes of all other Insuring Agreements:

a.    any act or series of related acts or events involving one or more persons;  or

b.    any act, acts or events involving a person or group of persons acting together;

whether identified or not, both during and before the **Policy Period**.

SS.    **Sponsored Plan** means any employee benefit plan or employee pension benefit plan solely sponsored by any **Insured** that is not subject to the terms of ERISA.

TT.    **Subsidiary** means:

1.    any corporation, partnership, limited liability company or other entity, organized under the laws of any jurisdiction in which, on or before the Inception Date set forth in ITEM 2 of the Declarations, the **Insured** owns, directly or indirectly, more than 50% of the outstanding securities or voting rights representing the present right to elect, appoint, or exercise a majority control over such entity's board of directors, board of trustees, board of managers, natural person general partners, or functional equivalent; or

2.    subject to the provisions set forth in Section II. GENERAL AGREEMENTS D. ACQUISITIONS, of the Crime Terms and Conditions, any entity that the **Insured** acquires or forms during the **Policy Period** in which the **Insured** owns, directly or indirectly, more than 50% of the outstanding securities or voting rights representing the present right to elect, appoint or exercise a majority control over such entity's board of directors, board of trustees, board of managers, natural person general partners, or functional equivalent.

**Subsidiary** does not include any entity in which any **Insured** is engaged as a participant in any type of joint venture unless such entity is specifically scheduled as an additional **Insured** by endorsement to this **Crime Policy**.

UU.    **Theft** means:

1.     under Insuring Agreement A.3., the intentional unlawful taking of **Money**, **Securities** and **Other Property** to the deprivation of a **Client**;

2.     under Insuring Agreements C. or D., the intentional unlawful taking of **Money** and **Securities** to the **Insured's** deprivation.

3.     under all other Insuring Agreements, the intentional unlawful taking of **Money**, **Securities** and **Other Property** to the **Insured's** deprivation.

VV.     *Transfer Account* means an account maintained by the **Insured** at a **Financial Institution** from which the **Insured** can initiate the transfer, payment or delivery of **Money** or **Securities**:

1.     by means of electronic, telegraphic, cable, teletype, telefacsimile or telephone instructions communicated directly or through an electronic funds transfer system; or

2.     by means of written instructions (other than those described in Insuring Agreements B. and H.1.) establishing the conditions under which such transfers are to be initiated by such **Financial Institution** through an electronic funds transfer system.

---

## IV.    EXCLUSIONS

A.     This **Crime Policy** will not apply to loss resulting directly or indirectly from war, whether or not declared; civil war; insurrection; rebellion or revolution; military, naval or usurped power; governmental intervention, expropriation or nationalization; or any act or condition related to any of the foregoing.

B.     This **Crime Policy** will not apply to loss resulting directly or indirectly from seizure or destruction of property by order of governmental authority.

C.     This **Crime Policy** will not apply to loss resulting directly or indirectly from any fraudulent, dishonest or criminal act committed by the **Insured**, the **Insured's** natural person partners, any **LLC Member** or **Officer-Shareholder**, whether acting alone or in collusion with others; provided, this Exclusion C. will not apply to loss covered under Insuring Agreement A.2..

D.     This **Crime Policy** will not apply to loss resulting directly or indirectly from any fraudulent, dishonest or criminal act committed by any **Employee** or **Fiduciary** whether acting alone or in collusion with others, unless covered under Insuring Agreements A.1., A.2., A.3., F.2., or H..

E.     This **Crime Policy** will not apply to loss resulting directly or indirectly from any **Funds Transfer Fraud**, unless covered under Insuring Agreements A.1., A.2., A.3., or G..

F.     This **Crime Policy** will not apply to loss resulting directly or indirectly from the **Insured's** acceptance of money orders or **Counterfeit Money**, unless covered under Insuring Agreements A.1., A.2., A.3. or E..

G.     This **Crime Policy** will not apply to loss or damages resulting directly or indirectly from the input of **Electronic Data** by a natural person having the authority to enter the **Insured's Computer System**, unless covered under Insuring Agreements A.1., A.2., A.3., F.2. or G..

H.     This **Crime Policy** will not apply to loss resulting directly or indirectly from forged, altered or fraudulent documents or written instruments used as source documentation in the preparation of **Electronic Data**, unless covered under Insuring Agreements A.1., A.2., or A.3..

I.     This **Crime Policy** will not apply to any expenses incurred by the **Insured** in establishing the existence or the amount of any loss covered under this **Crime Policy**, unless covered under Insuring Agreement I..

J.     This **Crime Policy** will not apply to loss of income, whether or not earned or accrued, or potential income, including interest and dividends, not realized by the **Insured** as the result of any loss covered under this **Crime Policy**.

K.     This **Crime Policy** will not apply to damages of any type, except the **Insured's** direct compensatory damages resulting from a loss covered under this **Crime Policy**.

---

©2009 The Travelers Companies, Inc. All Rights Reserved

L.      This **Crime Policy** will not apply to indirect or consequential loss of any nature, including fines, penalties, multiple or punitive damages.

M.      This **Crime Policy** will not apply to loss resulting directly or indirectly from any **Theft**, disappearance, damage, destruction or disclosure of any intangible property or confidential information including:

1.      trade secret information, confidential processing methods or other confidential information or intellectual property of any kind, or **Electronic Data** unless otherwise covered under Insuring Agreement F.2.; or

2.      **Computer Programs**.

N.      This **Crime Policy** will not apply to loss of, or damage to, manuscripts, records, accounts, microfilm, tapes or other records, whether written or electronic, or the cost of reproducing any information contained in such lost or damaged records, except when covered under Insuring Agreements C., D., or F.2..

O.      This **Crime Policy** will not apply to loss, or that part of any loss, the proof of which as to its existence or amount is dependent solely upon:

1.      an inventory computation or physical count; or

2.      a profit and loss computation;

provided that where the  **Insured** establishes wholly apart from such computations or physical count that the **Insured** has sustained a loss covered under Insuring Agreements A.1., A.2, A.3. or F.1., then the **Insured** may offer the **Insured's** inventory records and an actual physical count of inventory in support of other evidence as to the amount of loss claimed.

P.      This **Crime Policy** will not apply to loss resulting directly or indirectly from trading whether or not in the name of the **Insured** or whether or not in a genuine or fictitious account, unless covered under Insuring Agreement A.1, A.2. or A.3..

Q.      This **Crime Policy** will not apply to loss resulting directly or indirectly from fire, except:

1.      loss of or damage to **Money** or **Securities**; or

2.      damage to any safe or vault caused by the application of fire thereto in connection with any actual or attempted **Safe Burglary** when covered under Insuring Agreement C..

R.      This **Crime Policy** will not apply to loss resulting directly or indirectly from the giving or surrendering of **Money**, **Securities** or **Other Property** in any exchange or purchase, whether or not fraudulent, with any other party not in collusion with an **Employee**, except when covered under Insuring Agreement E..

S.      This **Crime Policy** will not apply to loss of **Money**, **Securities** or **Other Property** while in the custody of any **Financial Institution**, trust company, or similarly recognized place of safe deposit or armored motor vehicle company unless the loss is in excess of the amount recovered or received by the **Insured** under the **Insured's** contract, if any, with, or insurance carried by, any of the aforementioned.

T.      This **Crime Policy** will not apply to loss of **Money**, **Securities** or **Other Property** held by an armored motor vehicle company for the **Insured**, and which is stored by such company overnight inside buildings used in the conduct of its business.

U.      This **Crime Policy** will not apply to loss resulting directly or indirectly from nuclear reaction, nuclear radiation, radioactive contamination, biological or chemical contamination or to any related act or incident.

V.      This **Crime Policy** will not apply to loss of **Money**, **Securities** or **Other Property** resulting directly or indirectly from kidnap, extortion or ransom payments (other than **Robbery**) surrendered to any person as a result of a threat.

W.      This **Crime Policy** will not apply to loss resulting directly or indirectly from **Forgery** or alteration, except when covered under Insuring Agreements A.1., A.2., A.3., B., or H..

X.      This **Crime Policy** will not apply to loss resulting directly or indirectly from **Computer Fraud**, except when covered under Insuring Agreements A.1., A.2., A.3., F.1., or H.1..

Y.     This **Crime Policy** will not apply to loss under Insuring Agreements C. or D. resulting directly or indirectly from:

1.     an accounting or arithmetical error or omission;

2.     the loss of property from within any money operated device, unless the amount of **Money** deposited in it is recorded by a continuous recording device;

3.     anyone, acting on the **Insured's** express or implied authority, being induced by any dishonest act to voluntarily part with title to or possession of any property;

4.     damage to motor vehicles, trailers or semi-trailers or equipment and accessories attached to them; or

5.     damage to the **Premises** or its exterior or to containers of covered property by vandalism or malicious mischief.

Z.     This **Crime Policy** will not apply to loss resulting directly or indirectly from the diminution in value of **Money**, **Securities** or **Other Property**.

AA.    This **Crime Policy** will not apply to loss arising from any **Credit**, **Debit or Charge Card** if the **Insured**, the **Insured's Employee** or **Management Staff Member** has not fully complied with the provisions, conditions or other terms under which any card was issued.

BB.    This **Crime Policy** will not apply to loss sustained by any **Subsidiary** or related **Employee Benefit Plan** or **Sponsored Plan**, occurring at any time during which such entity was not a **Subsidiary** or related **Employee Benefit Plan** or **Sponsored Plan**.

CC.    This **Crime Policy** will not apply to loss sustained by the **Insured** or any **Subsidiary** to the extent it results in a benefit, gain or transfer to the **Insured** or any **Subsidiary**, except to the extent that such loss is covered under Insuring Agreement A.2..

## *V.     CONDITIONS*

## A.     GENERAL CONDITIONS

1.     Territory Covered

Except as indicated in Item 5. of the Declarations,

a.     the Company will cover loss the **Insured** sustains anywhere in the world, and

b.     the Company will cover all of the **Insured's** offices and **Premises**, including any additional offices or **Premises** pursuant to Sections II. GENERAL AGREEMENTS B. ADDITIONAL OFFICES, C. CONSOLIDATION, MERGER OR PURCHASE OF ASSETS, and D. ACQUISITIONS in this **Crime Policy**.

2.     Cooperation

The **Insured** must cooperate with the Company in all matters pertaining to this **Crime Policy** as stated in its terms, conditions and limitations.

3.     Extended Period to Discover Loss

The Company will pay the **Insured** for loss that the **Insured** sustained prior to the effective date of cancellation or termination of this **Crime Policy**, which is **Discovered** by the **Insured**:

a.     no later than 90 days from the date of cancellation or termination; and

b.     as respects any **Employee Benefit Plan**, no later than one (1) year from the date of cancellation or termination.

Notwithstanding the above, this extended period to **Discover** loss terminates immediately upon the effective date of any other insurance obtained by the **Insured** replacing in whole or in part the insurance afforded by this **Crime Policy**, whether or not such other insurance provides coverage for loss sustained prior to its effective date.

4.     Other Insurance

This **Crime Policy** applies only as excess insurance over, and will not contribute with: (1) any other valid and collectible insurance available to any **Insured** unless such insurance is written specifically excess of this **Crime Policy** by reference in such other policy to the Policy Number of this **Crime Policy**; and (2) indemnification to which any **Insured** is entitled from any other entity other than any **Insured**. As excess insurance, this **Crime Policy** will not apply or contribute to the payment of any loss to the **Insured** until the amount of such other insurance or indemnity has been exhausted by loss covered thereunder. If the limit of the other insurance or indemnity is insufficient to cover the entire amount of the loss, this **Crime Policy** will apply to that part of the loss not recoverable or recovered under the other insurance or indemnity. This **Crime Policy** will not be subject to the terms of any other insurance.

Any loss that is applicable to this Condition A.4. is subject to both the applicable Single Loss Limit of Insurance and applicable Single Loss Retention shown in ITEM 5 of the Declarations.

If this **Crime Policy** replaces prior insurance that provided the **Insured** with an extended period of time after the termination or cancellation of such prior insurance in which to **Discover** loss, then, and only with respect to loss **Discovered** during such extended period but sustained prior to the termination of such prior insurance, the coverage afforded by this **Crime Policy** applies as follows:

a.     the Company will have no liability for such loss, unless the amount of such loss exceeds the limit of insurance of that prior insurance; provided, that in such case, the Company will pay the **Insured** for the excess of such loss subject to the terms and conditions of this **Crime Policy**; and

b.     any payment the Company makes to the **Insured** for such excess loss will not be greater than the difference between the limit of insurance of the **Insured's** prior insurance and the applicable Single Loss Limit of Insurance of this **Crime Policy**. The Company will not apply the applicable Single Loss Retention to such excess loss.

5.     Ownership of Property; Interests Covered

a.     The property covered under this **Crime Policy** except as provided in 5.b. below is limited to property:

i.      that the **Insured** owns or leases;

ii.     that the **Insured** holds for others:

(a)     on the **Insured's Premises** or the **Insured's Financial Institution Premises**; or

(b)     while in transit and in the care and custody of a **Messenger**; or

iii.    for which the **Insured** is legally liable, except for property located inside the **Insured's Client's Premises** or the **Insured's Client's Financial Institution Premises**.

Notwithstanding the above, this **Crime Policy** is for the **Insured's** benefit only and provides no rights or benefits to any other person or organization. Any claim for loss that is covered under this **Crime Policy** must be presented by the **Insured**.

b.     If ITEM 5 of the Declarations indicates that coverage under Insuring Agreement A.3. Employee Theft of Client Property has been purchased, then the property covered under Insuring Agreement A.3. is limited to property:

      i.        that the **Insured's Client** owns or leases;

      ii.       that the **Insured's Client** holds for others; or

      iii.     for which the **Insured's Client** is legally liable;

while the property is inside the **Insured's Client's Premises** or the **Insured's Client's Financial Institution Premises**.

Notwithstanding the above, this **Crime Policy** is for the **Insured's** benefit only and provides no rights or benefits to any other person or organization, including the **Insured's Client**. Any claim for loss by the **Insured's Client** that is covered under this **Crime Policy** must be presented by the **Insured**.

6.      Representation, Concealment, Misrepresentation or Fraud

No statement made by the **Insured**, whether contained in the application, underwriting information or otherwise, is deemed to be a warranty of anything except that it is true to the best of the knowledge and belief of the person making the statement.

This **Crime Policy** is void in any case of fraud by the **Insured** as it relates to this **Crime Policy** at any time. This **Crime Policy** is also void if the **Insured**, at any time, intentionally conceals or misrepresents a material fact concerning:

      a.     this **Crime Policy**;

      b.     the **Money**, **Securities** or **Other Property**;

      c.     the **Insured's** interest in the **Money**, **Securities** or **Other Property**; or

      d.     a claim under this **Crime Policy**.

7.      Premiums

The **First Named Insured** is responsible for the payment of all premiums and will be the payee for any return premiums the Company pays.

8.      Transfer of Rights and Duties Under this **Crime Policy**

Rights and duties under this **Crime Policy** may not be transferred without the Company's written consent except in the case of the death of a natural person **Insured**. If such person dies, then the decedent's rights and duties will be transferred to the decedent's legal representative, but only while acting within the scope of duties as the decedent's legal representative. Until a legal representative is appointed, anyone having proper temporary custody of the decedent's property will have all rights and duties but only with respect to that property.

## B.    PROVISIONS AFFECTING LOSS ADJUSTMENT AND SETTLEMENT

1.      Limit of Insurance

      a.     <u>Policy Aggregate Limit of Insurance</u>

If ITEM 5 of the Declarations indicates that this **Crime Policy** includes a Policy Aggregate Limit of Insurance, then the Company's total liability for all loss **Discovered** during the **Policy Period** will not exceed such Policy Aggregate Limit of Insurance. The Policy Aggregate Limit of Insurance will be reduced by the amount of any payment made under the terms of this **Crime Policy**. If the Policy Aggregate Limit of Insurance is exhausted by any payment made for loss **Discovered** during the **Policy Period**, the Company will have no further liability for loss regardless of when **Discovered** and whether or not previously reported to the Company.

©2009 The Travelers Companies, Inc. All Rights Reserved

If applicable, the Policy Aggregate Limit of Insurance will be reinstated to the extent of any net recovery pursuant to Condition B.6. that is received by the Company during the **Policy Period** and before the Crime Policy Aggregate Limit of Insurance is exhausted. Recovery from reinsurance or indemnity, or both, for the Company's benefit will not be deemed a recovery as used herein. In the event that a loss of **Securities** is settled by the Company through the use of a Lost Securities Bond, such loss will not reduce the Crime Policy Aggregate Limit of Insurance, but any payment under the Lost Securities Bond reduces the Policy Aggregate Limit of Insurance under this **Crime Policy**.

The provisions of this Condition B.1.a. will not be applicable to Insuring Agreement A.2.

If ITEM 5 of the Declarations indicates that this **Crime Policy** does not include a Crime Policy Aggregate Limit of Insurance, then payment of loss under this **Crime Policy** will not reduce the Single Loss Limit of Insurance for other **Single Losses**.

b.      Single Loss Limit of Insurance

The maximum Single Loss Limit of Insurance for each Insuring Agreement will not exceed the applicable amount set forth in ITEM 5 of the Declarations for such Insuring Agreement.

c.      Special Limit of Insurance for Specified Other Property

The Company's liability for loss under Insuring Agreements C. and D. is limited as follows

i.      the lesser of $25,000. or the amount shown as the Single Loss Limit of Insurance for any **Single Loss** involving precious metals, precious or semi-precious stones, pearls, furs, or completed articles made of or containing such  enumerated materials that constitute more than half the value of such articles;

ii.      the lesser of $25,000. or the amount shown as the Single Loss Limit of Insurance for any **Single Loss**, including damage to manuscripts, drawings or records of any kind, or the cost of reconstructing them or reproducing any information contained in them;

The Special Limit of Insurance for Specified Other Property is part of, and not in addition to, any applicable limit of liability.

d.      Identity Fraud Expense Reimbursement Single Loss Limit of Insurance

The maximum limit of insurance per the **Insured's Management Staff Member** for each **Identity Fraud** covered under Insuring Agreement H.2. will not exceed the applicable Single Loss Limit of Insurance stated in ITEM 5 of the Declarations. All acts incidental to an **Identity Fraud**, any series of **Identity Frauds**, and all **Identity Frauds** arising from the same method of operation, whether committed by one or more persons, will be deemed to arise out of one act and will be treated as one **Identity Fraud**. If an act causes a covered loss under Insuring Agreement H.2. to more than one **Management Staff Member**, the applicable Single Loss Limit of Insurance and Retention under Insuring Agreement H.2. applies to each **Management Staff Member** separately.

e.      Loss Covered Under More Than One Insuring Agreement of this  **Crime Policy**

Subject to any applicable Crime Policy Aggregate Limit of Insurance, if any **Single Loss** is comprised of loss covered under more than one Insuring Agreement, the most the Company will pay the **Insured** for such **Single Loss** is the lesser of:

i.      the actual amount of such **Single Loss**; or

    ii.    the sum of the Single Loss Limits of Insurance applicable to such Insuring Agreements applying to such loss.

2.    Single Loss Retention

The Company will not pay the **Insured** for any **Single Loss** unless the amount of such **Single Loss** exceeds the Single Loss Retention shown in Item 5 of the Declarations. The Company will pay the **Insured** the amount of any **Single Loss** in excess of the Single Loss Retention, up to the Single Loss Limit of Insurance for the applicable Insuring Agreement.

If more than one Single Loss Retention applies to the same **Single Loss**, then only the highest Single Loss Retention will be applied.

No Single Loss Retention applies to any legal expenses paid to the **Insured** solely under Insuring Agreement B.

3.    The Insured's Duties in the Event of a Loss

After the **Insured Discovers** a loss or a situation that may result in loss of or loss from damage to **Money**, **Securities** or **Other Property** that exceeds 25% of the Single Loss Retention, the **Insured** must:

    a.    notify the Company as soon as possible;

    b.    notify law enforcement authorities if the **Insured** has reason to believe that any loss, except for loss covered under Insuring Agreements A.1., A.2., A.3., or F.2., involves a violation of law;

    c.    submit to examination under oath at the Company's request and give the Company a signed statement of the **Insured's** answers;

    d.    give the Company a detailed, sworn proof of loss within 120 days; and

    e.    cooperate with the Company in the investigation and settlement of any claim.

Proof of loss under Insuring Agreement B. and H.1. must include: (1) an affidavit of **Forgery** setting forth the amount and cause of loss; and (2) the original written **Covered Instruments** or **Personal Covered Instruments** or a copy of such written instruments.

4.    Valuation / Settlement

Subject to the applicable limit of insurance provision (Section V. CONDITIONS B. PROVISIONS AFFECTING LOSS ADJUSTMENT AND SETTLEMENT 1. <u>Limit of Insurance</u>) the Company will pay the **Insured** for:

    a.    loss of **Money** but only up to and including its face value, and, at the Company's option, pay for loss of **Money** issued by any country other than the United States of America:

        i.    at face value in the **Money** issued by that country; or

        ii.    in the United States of America dollar equivalent determined by the rate of exchange published in The Wall Street Journal on the day the loss was **Discovered**;

    b.    loss of **Securities** but only up to and including their value at the close of business on the day the loss was **Discovered**, and at the Company's option:

        i.    pay the **Insured** the value of such **Securities** or replace them in kind, in which event the **Insured** must assign to the Company all the **Insured's** rights, title and interest in those **Securities**; or

    ii.      pay the cost of any Lost Securities Bond required in connection with issuing duplicates of the **Securities**; provided, the Company will be liable only for the cost of the Lost Securities Bond as would be charged for a bond having a penalty not exceeding the lesser of the value of the **Securities** at the close of business on the day the loss was **Discovered**;

c.    loss of, or loss from damage to, **Other Property** or **Premises** including its exterior for the replacement cost without deduction for depreciation; provided, the Company will pay the **Insured** the lesser of the following:

    i.      the applicable Single Loss Limit of Insurance;

    ii.      the cost to replace **Other Property** or **Premises** including its exterior with property of comparable material and quality, and used for the same purpose; or

    iii.      the amount  the **Insured** actually spends that is necessary to repair or replace such property;

provided, the Company will, at its option, pay the **Insured** for loss of, or loss from damage to, **Other Property** or **Premises** including its exterior, in the **Money** of the country in which the loss occurred, or in the United States of America dollar equivalent of the **Money** of the country in which the loss occurred determined by the rate of exchange published in The Wall Street Journal on the day the loss was **Discovered**.

The Company will not pay the **Insured** on a replacement cost basis for any loss or damage until such property is actually repaired or replaced, and unless the repairs or replacement are made as soon as reasonably possible after the loss or damage. If the lost or damaged property is not repaired or replaced, the Company will pay the **Insured** actual cash value on the day the loss was **Discovered**.

Any property that the Company pays the **Insured** for or replaces becomes the Company's property.

5.    Records

The **Insured** must keep records of all **Money**, **Securities**, and **Other Property** under this **Crime Policy** so the Company can verify the amount of any loss.

6.    Recoveries

a.    All recoveries for payments made under this **Crime Policy** should be applied, after first deducting the costs and expenses incurred in obtaining such recovery, in the following order of priority:

    i.      first, to the **Insured** to reimburse the **Insured** for loss sustained that would have been paid under this **Crime Policy** but for the fact that it is in excess of the applicable Single Loss Limit(s) of Insurance;

    ii.      second, to the Company in satisfaction of amounts paid or to be paid to the **Insured** in settlement of the **Insured's** covered claim;

    iii.      third, to the **Insured** in satisfaction of any Single Loss Retention; and

    iv.      fourth, to the **Insured** in satisfaction of any loss not covered under this **Crime Policy**.

b.    The value of all property received by the **Insured** from any source whatever and whenever received, in connection with any matter from which a loss has arisen, will be valued as of the date received and will be deducted from the covered loss.

c. Recoveries do not include any recovery:

    i. from insurance, suretyship, reinsurance, security or indemnity taken for the Company's benefit; or

    ii. of original **Securities** after duplicates of them have been issued.

7. Transfer of the Insured's Rights of Recovery Against Others to the Company

The **Insured** must transfer to the Company all the **Insured's** rights of recovery against any person or organization for any loss the **Insured** sustained and for which the Company has paid or settled. The **Insured** must also do everything necessary to secure those rights and do nothing after loss to impair them.

8. Legal Action Against the Company

The **Insured** may not bring any legal action against the Company involving loss:

    a. unless the **Insured** has complied with all the terms of this **Crime Policy**;

    b. until 90 days after the **Insured** has filed proof of loss with the Company; and

    c. unless brought within two (2) years from the date the **Insured Discovers** the loss.

If any limitation in this Condition B.8. is deemed to be inconsistent with applicable law, such limitation is amended so as to equal the minimum period of limitation provided by such law.

9. Liberalization

If the Company adopts any revision to the Crime Terms and Conditions of this **Crime Policy** that would broaden coverage and such revision does not require an additional premium or endorsement and the revision is adopted within 45 days prior to or during the **Policy Period**, the broadened coverage will apply to this **Crime Policy** as of the date the revision is approved for general use by the applicable department of insurance.

## C.   EMPLOYEE BENEFIT PLAN PROVISIONS – INFLATION GUARD

In compliance with certain provisions of ERISA:

1. if any **Employee Benefit Plan** is insured jointly with any other entity under this **Crime Policy**, the **Insured** must select a Single Loss Limit of Insurance for Insuring Agreement A.2. that is sufficient to provide an amount of insurance for each **Employee Benefit Plan** that is at least equal to that required if each **Employee Benefit Plan** were insured separately;

2. if the **Insured** is an entity other than an **Employee Benefit Plan**, any payment the Company makes to the **Insured** for loss sustained by any **Employee Benefit Plan** will be held by such **Insured** for the use and benefit of the **Employee Benefit Plan(s)** sustaining the loss; and

3. if two or more **Employee Benefit Plans** are covered under this **Crime Policy**, any payment the Company makes for loss:

    a. sustained by two or more **Employee Benefit Plans**; or

      b.      of commingled **Money**, **Securities** or **Other Property** of two or more **Employee Benefit Plans**;

that arises out of a **Single Loss** is to be shared by each **Employee Benefit Plan** sustaining loss, in the proportion that the limit of insurance required under ERISA for each such **Employee Benefit Plan**, bears to the total of those limits of insurance.

      4.      If, at the inception date of this **Crime Policy**, or a preceding policy written by the Company that provided ERISA fidelity coverage for **Employee Benefit Plans**, the **Insured** has or had a Single Loss Limit of Insurance under such ERISA fidelity coverage for **Employee Benefit Plans** that is or was equal to or greater than the limit of insurance required under ERISA, the Single Loss Limit of Insurance under Insuring Agreement A.2. will equal the greater of the amount of the limit of insurance required by ERISA or the Single Loss Limit of Insurance set forth in Item 5. of the Declarations for Insuring Agreement A.2.

## D.    CANCELLATION OR TERMINATION

1.    The **Insured** may cancel:

      a.      this **Crime Policy** in its entirety;

      b.      an Insuring Agreement; or

      c.      coverage for any **Insured**;

by mailing or delivering to the Company advance written notice of cancellation.

2.    The Company may cancel:

      a.      this **Crime Policy** in its entirety;

      b.      an Insuring Agreement; or

      c.      coverage for any **Insured**;

by mailing or delivering to the **First Named Insured** written notice of cancellation at least 20 days before the effective date of cancellation if the Company cancels for nonpayment of premium; or 60 days before the effective date of cancellation if the Company cancels for any other reason.

The Company will mail or deliver the Company's notice to the **First Named Insured's** last mailing address known to the **Company**. Notice of cancellation will state the effective date of cancellation and the **Policy Period** will end on that date. If this **Crime Policy** or an Insuring Agreement is cancelled, the Company will send the **First Named Insured** any premium refund due. If the Company cancels this **Crime Policy**, the refund will be pro rata. If the **Insured** cancels, the earned premium will be computed in accordance with the customary short rate table and procedure. The cancellation will be effective even if the Company has not made or offered a refund. If notice is mailed, proof of mailing will be sufficient proof of notice.

3.    This **Crime Policy** terminates:

      a.      in its entirety immediately upon the expiration of the **Policy Period**;

b. in its entirety immediately upon exhaustion of the Policy Aggregate Limit of Insurance, if applicable; provided, that no **Crime Policy** termination under this Condition D.3.b. will be effective with respect to any **Employee Benefit Plan** covered under Insuring Agreement A.2.;

c. in its entirety immediately upon the voluntary liquidation or dissolution of the **First Named Insured**; provided, that no **Crime Policy** termination under this Condition D.3.c. will be effective with respect to any **Employee Benefit Plan** covered under Insuring Agreement A.2.; or

d. as to any **Subsidiary** immediately upon the **Change of Control** of such **Subsidiary**.

4. This **Crime Policy** terminates as to any **Employee**:

a. as soon as the **Insured's** partner, any of the **Insured's Management Staff Members** or any **Employee** with managerial or supervisory responsibility not in collusion with the **Employee** becomes aware of any dishonest or fraudulent employment related act involving an amount in excess of $10,000; or

b. 60 days after the **Insured's** partner, any of the **Insured's Management Staff Members** or any **Employee** with managerial or supervisory responsibility not in collusion with the **Employee** becomes aware of any dishonest or fraudulent non-employment related act; either of which acts were committed by such **Employee** in the **Insured's** service, during the term of employment by the **Insured** or prior to employment by the **Insured**, provided such dishonest or fraudulent non-employment related act involved **Money**, **Securities** or **Other Property** is in an amount in excess of $10,000.

## E. CHANGES

Only the **First Named Insured** is authorized to make changes in the terms of this **Crime Policy** and solely with the Company's prior written consent. This **Crime Policy's** terms can be changed, amended or waived only by endorsement issued by the Company and made a part of this **Crime Policy**. Notice to any representative of the **Insured** or knowledge possessed by any agent or by any other person will not effect a waiver or change to any part of this **Crime Policy**, or estop the Company from asserting any right under the terms, conditions and limitations of this **Crime Policy**, nor may the terms, conditions and limitations hereunder be waived or changed, except by a written endorsement to this **Crime Policy** issued by the Company.

## F. ENTIRE AGREEMENT

The Declarations, the application, the Crime Terms and Conditions, and any endorsements attached thereto, constitute the entire agreement between the **Insured** and the Company.

## G. HEADINGS

The titles of the various paragraphs of this **Crime Policy** and its endorsements are inserted solely for convenience or reference and are not to be deemed in any way to limit or affect the provision to which they relate.

©2009 The Travelers Companies, Inc. All Rights Reserved

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## REPLACE GENERAL AGREEMENT E. - CHANGE OF CONTROL - NOTICE REQUIREMENTS ENDORSEMENT

This endorsement changes the following:

**Crime**

**It is agreed that:**

The following replaces section **II. GENERAL AGREEMENTS**, **E. CHANGE OF CONTROL – NOTICE REQUIREMENTS**:

**E.    CHANGE OF CONTROL – NOTICE REQUIREMENTS**

When the **Insured** learns that a **Change of Control** has taken place as to the **First Named Insured**, or will take place during the **Policy Period**, the **Insured** must give the Company written notice within 90 days of the effective date of such **Change of Control**.

Nothing herein contained shall be held to vary, alter, waive, or extend any of the terms, conditions, exclusions, or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **106446911**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## GLOBAL COVERAGE COMPLIANCE ENDORSEMENT – ADDING FINANCIAL INTEREST COVERAGE AND SANCTIONS CONDITION AND AMENDING TERRITORY CONDITION

This endorsement changes the following:

**Crime**

**It is agreed that:**

1.  The following is added to section **III. DEFINITIONS**:

    *Financial Interest* means the **First Named Insured's** insurable interest in an **Insured** that is domiciled in a country or jurisdiction in which the Company is not licensed to provide this insurance, as a result of the **First Named Insured's**:

    1.  ownership of the majority of the outstanding securities or voting rights of the **Insured** representing the present right to elect, appoint, or exercise a majority control over such **Insured's** board of directors, board of trustees, board of managers, natural person general partner, or functional foreign equivalent;

    2.  indemnification of, or representation that it has an obligation to indemnify, the **Insured** for loss sustained by such **Insured**; or

    3.  election or obligation to obtain insurance for such **Insured**.

2.  The following replaces section **V. CONDITIONS**, **A. GENERAL CONDITIONS**, 1., Territory Covered:

    1.  Territory Covered

        a.  Except as indicated in Item 5. of the Declarations,

            i.   the Company will cover loss the **Insured** sustains anywhere in the world, and

            ii.  the Company will cover all of the **Insured's** offices and **Premises**, including any additional offices or **Premises** pursuant to sections II. GENERAL AGREEMENTS B. ADDITIONAL OFFICES, C. CONSOLIDATION, MERGER OR PURCHASE OF ASSETS, and D. ACQUISITIONS in this **Crime Policy**.

        b.  This **Crime Policy** does not apply to:

            i.   loss sustained by an **Insured** domiciled; or

            ii.  loss of **Other Property** located,

            in any country or jurisdiction in which the Company is not licensed to provide this insurance, to the extent that providing this insurance would violate the laws or regulations of such country or jurisdiction.

        c.  In the event an **Insured** sustains loss referenced in b. above to which this **Crime Policy** would have applied, the Company will reimburse the **First Named Insured** for its loss, on account of its **Financial Interest** in such **Insured**.

---

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **106446911**

© 2015 The Travelers Indemnity Company. All rights reserved.

3.      The following is added to section **V. CONDITIONS**, **B. PROVISIONS AFFECTING LOSS ADJUSTMENT AND SETTLEMENT**:

In the event the Company reimburses the **First Named Insured** on account of its **Financial Interest** in an **Insured**, as a condition precedent to exercising rights under this **Crime Policy**, the **First Named Insured** will cause the **Insured** to comply with the conditions of this **Crime Policy**.

4       The following is added to section **V. CONDITIONS**:

**SANCTIONS**

This **Crime Policy** will provide coverage for any loss or expenses, or otherwise will provide any benefit, only to the extent that providing such coverage or benefit does not expose the Company or any of its affiliated or parent companies to any trade or economic sanction under any law or regulation of the United States of America or any other applicable trade or economic sanction, prohibition or restriction.

---

Nothing herein contained shall be held to vary, alter, waive, or extend any of the terms, conditions, exclusions, or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

© 2015 The Travelers Indemnity Company. All rights reserved.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

### REPLACE INSURING AGREEMENT A. 2. ERISA FIDELITY ENDORSEMENT

This endorsement changes the following:

**Crime**

**It is agreed that:**

1.  The following replaces section **I. Insuring Agreements**, A. 2. ERISA Fidelity:

    The Company will pay the **Insured** for direct loss of, or direct loss from damage to, **Money**, **Securities** and **Other Property** that belongs to an **Employee Benefit Plan**, directly caused by acts of **Fraud or Dishonesty** committed by a **Fiduciary**, whether identified or not, acting alone or in collusion with other persons.

2.  The following is added to section **III. DEFINITIONS**:

    **Fraud or Dishonesty** has the meaning set forth in Title 29, Code of Federal Regulations, Section 2580.412-9.

Nothing herein contained shall be held to vary, alter, waive, or extend any of the terms, conditions, exclusions, or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **106446911**

© 2016 The Travelers Indemnity Company. All rights reserved.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

## PENNSYLVANIA CHANGES ENDORSEMENT

This endorsement modifies insurance provided under the following:

**Crime**

---

**It is agreed that:**

The following is added to Section V. A. 8. **Transfer of Rights and Duties Under this Crime Policy**:

Upon the death of a natural person **Insured**, this Policy will remain in effect as provided in a. or b. below, whichever is later:

  a.  For 180 days after such person's death regardless of the **Policy Period** shown in the Declarations, unless the insured property is sold prior to that date; or

  b.  Until the end of the **Policy Period** shown in the Declarations, unless the insured property is sold prior to that date.

Coverage during the period of time after such person's death is subject to all provisions of this policy including payment of any premium due for the Policy Period shown in the Declarations and any extension of that period.

---

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein.  This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **106446911**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## CLIENT PROPERTY COVERAGE ENDORSEMENT

This endorsement modifies the following coverage:

**Crime**

**It is agreed that:**

The following applies to the coverage provided by **Insuring Agreement A. FIDELITY 3.** Employee Theft of Client Property as indicated below by ⊠ :

☒　　Section III. DEFINITIONS C. **Client** is amended to read as follows:

　　C.　　**Client** means an entity for which the **Insured** performs services as specified in a written agreement, but only while the written agreement is in effect.

\<OR\>

☐　　Section III. DEFINITIONS C. **Client** includes only those entities scheduled and described below:

SCHEDULE

Client　　　　　　　　　　　　　　　　　　Written Agreement Identification

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions,exclusions or limitations of the above-mentioned policy, except as expressly stated herein.  This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**

Policy Number: **106446911**

CRI-7021 Ed. 01-09 Printed in U.S.A.　　　　　　　　　　　　　　　　　　　　　　　　Page 1 of 1
©2009 The Travelers Companies, Inc. All Rights Reserved

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## ADDITIONAL INSUREDS ENDORSEMENT

This endorsement modifies the following coverage:

**Crime**

---

**It is agreed that:**

Solely with respect to the coverage shown above, the following are included as **Insureds** under the attached **Crime Policy**:

**SPM Holdings LLC**

**SPM Software, Inc.**

**SPM Professional Services, Inc**

**Turbine Cloud Services LLC**

**SPM Global Services LLC**

**SPM Global Services Inc**

**SPM Software LP**

**SPM Professional Services LP**

**Synygy India PVT, Ltd**

**Synygy Europa ARL**

---

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions,exclusions or limitations of the above-mentioned policy, except as expressly stated herein.  This endorsement is part of such policy and incorporated therein.

---

Issuing Company: **Travelers Casualty and Surety Company of America**

Policy Number: **106446911**

---

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## PENNSYLVANIA CANCELLATION OR TERMINATION ENDORSEMENT

This endorsement changes the following:

**Crime**

**It is agreed that:**

1.    The following replaces section **V., CONDITIONS**, D.2.:

    2.    The Company may cancel:

        a.    this **Crime Policy** in its entirety;

        b.    an Insuring Agreement; or

        c.    coverage for any **Insured**;

    by mailing or delivering to the **First Named Insured** written notice of cancellation at least **20** days (number of days must equal or exceed 20 days) before the effective date of cancellation if the Company cancels for nonpayment of premium; or **60** days (number of days must equal or exceed 60 days) before the effective date of cancellation if the Company cancels for any reason scheduled below. The Company may cancel for one or more of the following reasons:

    a.    nonpayment of premium,

    b.    material misrepresentation or fraud which affects insurability of risk,

    c.    the **Insured** has requested cancellation,

    d.    loss of or a substantial decrease in reinsurance certified by the Commissioner as affecting in-force policies,

    e.    a condition, factor or loss experience material to insurability has changed substantially or a substantial condition,

    f.    factor or loss experience material to insurability has become known during the policy period,

    g.    material failure to comply with policy terms, conditions or contractual duties,

    h.    the Company may cancel for failure to comply with safety standards or loss control recommendations when failure is specifically stated in the policy as possible grounds for cancellation and a) the Company has provided the insured with written notice of the failure to comply with safety standards and loss control recommendations, and b) the Company has provided the **First Named Insured** with a reasonable opportunity to cure deficiencies, but the deficiencies have not been corrected, or

    i.    the Commissioner may approve other reasons.

    The Company will mail or deliver the Company's notice to the **First Named Insured's** last mailing address known to the Company. Notice of cancellation will state the effective date of cancellation and the **Policy Period** will end on that date. If this **Crime Policy** or an Insuring Agreement is cancelled, the Company will send the **First Named Insured** any premium refund due, computed on a pro-rata basis. The cancellation will be effective even if the Company has not made or offered a refund. If notice is mailed, proof of mailing will be sufficient proof of notice.

2.    The following is added to section **V., CONDITIONS**, D. CANCELLATION OR TERMINATION:

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **106446911**

5.    The Company will not be required to renew this **Crime Policy** upon its expiration. If the Company elects not to renew, the Company will provide to the **First Named Insured** written notice to that effect by first class mail, registered mail or by delivery, and at least **60** days (number of days must equal or exceed 60 days) before the Expiration Date set forth in ITEM 2 of the Declarations. The notice of nonrenewal will be sent to the **First Named Insured's** mailing address last known to the Company.

6.    Notice of cancellation or nonrenewal will state the reason(s) for cancellation or nonrenewal. The notice of cancellation or nonrenewal will state that, at the **First Named Insured's** request, the Company will provide loss information to the **First Named Insured** for the period of at least three years or the period of time during which the Company have provided coverage to the **First Named Insured**, whichever is less. The **Named Insured's** written request for loss information must be made within 10 days of the **First Named Insured's** receipt of the notice of cancellation or nonrenewal.

---

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

©2013 The Travelers Indemnity Company, Inc. All rights reserved.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

### POLICY CHANGES ENDORSEMENT

This endorsement modifies the following:

**Crime**

**It is agreed that:**

1.  As of the Effective Date of this endorsement, the Declarations is amended, as indicated below by ☒:

☐  **ITEM 1**:

    ☐  **NAMED INSURED:**

    ☐  D/B/A:

    ☐  Principal Address:

☐  **ITEM 2**:

    POLICY PERIOD:

    Inception Date:               Expiration Date:
    12:01 A.M. standard time both dates at the Principal Address stated in ITEM 1.

☐  **ITEM 5**:  (but only for direct loss that the **Insured** sustains which is directly caused by a **Single Loss Discovered** on or after the Effective Date of this endorsement)

| CRIME | | |
|---|---|---|
| | **Single Loss Limit of Insurance** | **Single Loss Retention** |
| ☐ **Insuring Agreement A. Fidelity** <br> 1. Employee Theft <br> 2. ERISA Fidelity <br> 3. Employee Theft of Client Property | | |
| ☐ **Insuring Agreement  B. Forgery or Alteration** | | |
| ☐ **Insuring Agreement  C. On Premises** | | |
| ☐ **Insuring Agreement D.** | | |

Issuing Company: **Travelers Casualty and Surety Company of America**    Effective Date: **February 22, 2016**

Policy Number: **106446911**

©2014 The Travelers Indemnity Company. All rights reserved

| | | |
|---|---|---|
| **In Transit** | | |
| ☐ **Insuring Agreement E.** Money Orders and Counterfeit Money | | |
| ☐ **Insuring Agreement F.** Computer Crime<br><br>1. Computer Fraud<br><br>2. Computer Program and Electronic Restoration Expense | | |
| ☐ **Insuring Agreement G.** Funds Transfer Fraud | | |
| ☐ **Insuring Agreement H.** Personal Accounts Protection<br>1. Personal Accounts Forgery or Alteration<br>2. Identity Fraud Expense Reimbursement | | |
| ☐ **Insuring Agreement I.** Claim Expense | | |

☐     Policy Aggregate Limit of Insurance:     ☐     Applicable     ☐     Not Applicable

If a Policy Aggregate Limit of Insurance is applicable, then the Policy Aggregate Limit of Insurance for each **Policy Period** for Insuring Agreements A through H, inclusive, is:     **.**

If a Policy Aggregate Limit of Insurance is not included, then this **Crime Policy** is not subject to a Policy Aggregate Limit of Insurance as set forth in Section V. CONDITIONS B. PROVISIONS AFFECTING LOSS ADJUSTMENT AND SETTLEMENT 1. Limit of Insurance a. Policy Aggregate Limit of Insurance.

☐ **INSURED'S PREMISES COVERED: -** All Premises of the Insured in the United States of America, its territories and possessions, Canada, or any other country throughout the world, except:

☐     **ITEM 6**:

PREMIUM FOR THE POLICY PERIOD:

Policy Premium

Annual Installment Premium

2.  As of the Effective Date of this endorsement, this policy is amended as indicated below by ☒:

©2014 The Travelers Indemnity Company. All rights reserved

☐   Forms and endorsements added:

☐   Forms and endorsements deleted:

☒   Forms and endorsements amended:

**CRI-7028-0109**

---

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein.  This endorsement is part of such policy and incorporated therein.

©2014 The Travelers Indemnity Company. All rights reserved

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## ADDITIONAL INSUREDS ENDORSEMENT

This endorsement modifies the following coverage:

**Crime**

**It is agreed that:**

Solely with respect to the coverage shown above, the following are included as **Insureds** under the attached **Crime Policy**:

**SPM Holdings LLC**

**SPM Software, Inc.**

**SPM Professional Services, Inc**

**Turbine Cloud Services LLC**

**SPM Global Services LLC**

**SPM Global Services Inc**

**SPM Software LP**

**SPM Professional Services LP**

**Synygy India PVT, Ltd**

**Synygy Europa ARL**

**SPM Global Services PTE, Ltd f/k/a Synygy Asia PTE Ltd**

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions,exclusions or limitations of the above-mentioned policy, except as expressly stated herein.  This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**

Policy Number: **106446911**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## POLICY CHANGES ENDORSEMENT

This endorsement modifies the following:

**Crime**

**It is agreed that:**

1. As of the Effective Date of this endorsement, the Declarations is amended, as indicated below by ⊠:

☐     **ITEM 1**:

    ☐          **NAMED INSURED:**

    ☐          D/B/A:

    ☐          Principal Address:

☐     **ITEM 2**:

    POLICY PERIOD:

    Inception Date:                         Expiration Date:
    12:01 A.M. standard time both dates at the Principal Address stated in ITEM 1.

☐     **ITEM 5**:  (but only for direct loss that the **Insured** sustains which is directly caused by a **Single Loss Discovered** on or after the Effective Date of this endorsement)

| CRIME | | |
|---|---|---|
| | **Single Loss**<br>**Limit of Insurance** | **Single Loss**<br>**Retention** |
| ☐ **Insuring Agreement A.**<br>   **Fidelity**<br>   1.  Employee Theft<br>   2.  ERISA Fidelity<br>   3.  Employee Theft of Client<br>      Property | | |
| ☐ **Insuring Agreement  B.**<br>   **Forgery or Alteration** | | |
| ☐ **Insuring Agreement  C.**<br>   **On Premises** | | |
| ☐ **Insuring Agreement D.** | | |

Issuing Company: **Travelers Casualty and Surety Company of America**          Effective Date: **February 22, 2016**

Policy Number: **106446911**

©2014 The Travelers Indemnity Company. All rights reserved

| | | |
|---|---|---|
| **In Transit** | | |
| ☐ **Insuring Agreement E.**<br>**Money Orders and**<br>**Counterfeit Money** | | |
| ☐ **Insuring Agreement F.**<br>**Computer Crime**<br><br>1. Computer Fraud<br><br>2. Computer Program and<br>Electronic Restoration Expense | | |
| ☐ **Insuring Agreement G.**<br>**Funds Transfer Fraud** | | |
| ☐ **Insuring Agreement H.**<br>**Personal Accounts**<br>**Protection**<br>1. Personal Accounts Forgery<br>or Alteration<br>2. Identity Fraud Expense<br>Reimbursement | | |
| ☐ **Insuring Agreement I.**<br>**Claim Expense** | | |

☐    Policy Aggregate Limit of Insurance:    ☐    Applicable    ☐    Not Applicable

If a Policy Aggregate Limit of Insurance is applicable, then the Policy Aggregate Limit of Insurance for each
**Policy Period** for Insuring Agreements A through H, inclusive, is:    **.**
If a Policy Aggregate Limit of Insurance is not included, then this **Crime Policy** is not subject to a Policy Aggregate
Limit of Insurance as set forth in Section V. CONDITIONS B. PROVISIONS AFFECTING LOSS ADJUSTMENT
AND SETTLEMENT 1. Limit of Insurance a. Policy Aggregate Limit of Insurance.

☐    **INSURED'S PREMISES COVERED: -** All Premises of the Insured in the United States of America, its
territories and possessions, Canada, or any other country throughout the world, except:

☐    **ITEM 6**:

PREMIUM FOR THE POLICY PERIOD:

Policy Premium

Annual Installment Premium

2.  As of the Effective Date of this endorsement, this policy is amended as indicated below by ☒:

©2014 The Travelers Indemnity Company. All rights reserved

☒ Forms and endorsements added:
**CRI-7097-0109**

☐ Forms and endorsements deleted:

☐ Forms and endorsements amended:

---

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein.  This endorsement is part of such policy and incorporated therein.

CRI-7112 Rev. 12-14
©2014 The Travelers Indemnity Company. All rights reserved

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

## BLANKET CLIENT AND SERVICE BROKER AGREEMENT/ AMEND CLIENT PROPERTY LOCATION ENDORSEMENT

This endorsement modifies the following coverage:

**Crime**

---

**It is agreed that:**

Solely with respect to the coverage shown above:

1.      Section III. DEFINITIONS is amended by adding the following:

**Service Broker** means an entity, person or association with which the **Insured** has a written agreement for the **Insured** to perform services for **Clients** that are specified in the written agreement, but only while the written agreement is in effect.

2.      Section III. DEFINITIONS C. **Client** is replaced with the following:

C.      **"Client"** means an entity, person or association for which the **Insured** performs services as specified in a written agreement between the **Insured**  and a Service Broker, but only while the written agreement is in effect.

3.      Section III. DEFINITIONS D. **Client Premises** is deleted.

4.      Section V. CONDITIONS A.5.b. is replaced with the following:

b.      If ITEM 5 of the Declarations indicates that coverage under Insuring Agreement A.3. Employee Theft of Client Property has been purchased, then the property covered under Insuring Agreement A.3. is limited to property:
i.        that  the **Insured's Client** owns or leases;
ii.       that  the **Insured's Client** holds for others; or
iii.      for which the **Insured's Client** is legally liable.

Notwithstanding the above, this **Crime Policy** is for the **Insured's** benefit only and provides no rights or benefits to any other person or organization, including the **Insured's Service Broker** or **Client**. Any claim for loss by the **Insured's Client** that is covered under this **Crime Policy** must be presented by the **Insured**.

---

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein.  This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **106446911**

# EXHIBIT B



## IRONSHORE INDEMNITY INC.

(A Stock Company)
Mailing Address:
PO Box 3407
New York, NY  10008
(877) IRON411

This Policy is issued by the stock insurance company listed above (herein "Insurer").

## EXCESS LIABILITY INSURANCE POLICY DECLARATIONS

**UNLESS OTHERWISE PROVIDED IN THE FOLLOWED POLICY, THIS POLICY IS A CLAIMS MADE POLICY WHICH COVERS ONLY CLAIMS FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD. PLEASE READ THIS POLICY CAREFULLY.**

**Policy No.**  002642701
**Expiring Policy No.** 002642700

**ITEM 1.**  **INSURED COMPANY PRINCIPAL ADDRESS:**

SPM Corporate Services LLC; SPM Prof Services, Inc.; SPM Software, Inc.; Turbine Cloud Svcs, LLC
2501 Seaport Dr
Chester, PA  19013

**ITEM 2.**  **COVERAGE PROVIDED:** Excess Crime Insurance

**ITEM 3.**  **FOLLOWED POLICY:** Wrap + Crime Policy
**INSURER:** Travelers Casualty and Surety Company of America
**POLICY NUMBER:** 106446911

**ITEM 4.**  **POLICY PERIOD**

From February 22, 2017 12:01 A.M. To February 22, 2018  12:01 A.M.
(Local time at the address shown in ITEM 1.)

**ITEM 5.**  **PREMIUM** $8,512.00

**ITEM 6.**  **LIMIT OF LIABILITY/AGGREGATE LIMIT:** $9,500,000 for all Loss under all Coverages combined.

**ITEM 7.**  **UNDERLYING POLICY LIMITS/ATTACHMENT POINT:** $500,000

**ITEM 8.**  **PENDING & PRIOR LITIGATION DATE:**  N/A

**ITEM 9.     NOTICE TO INSURER**

        A.        Notice of Claim, Wrongful Act or Loss:

                Send to Company Indicated Above
                c/o Ironshore Insurance Services, LLC
                One State Street Plaza
                8th Floor
                New York, NY 10004

        B.        All other notices:

                Send to Company Indicated Above
                c/o Ironshore Insurance Services, LLC
                One State Street Plaza
                8th Floor
                New York, NY 10004

**ITEM 10.     BROKER:**
              **ADDRESS:**

              Joel  Manibo
              ARC MidAtlantic Excess & Surplus, Inc.
              129B Johnson Road
               SUITE NO 5
              Turnersville, NJ  08012
              **LICENSE #:** N/A

**ITEM 11.     FORMS AND ENDORSEMENTS:**

        1.    IRON.PN.001 (0513) OFAC Compliance Notice
        2.    EXC.END.086 (0316) No Aggregate Limit of Liability

THESE DECLARATIONS, TOGETHER WITH THE COMPLETED AND SIGNED APPLICATION, FOR THIS POLICY AND THE FOLLOWED POLICY, INCLUDING INFORMATION FURNISHED IN CONNECTION THEREWITH WHETHER DIRECTLY OR THROUGH PUBLIC FILING,  AND THE POLICY FORM ATTACHED HERETO, CONSTITUTE THE INSURANCE POLICY.

Date:  <u>February 28, 2017</u>
      MO/DAY/YR.                                 Authorized Representative

# OFFEREE DISCLOSURE NOTICE OF
# TERRORISM INSURANCE COVERAGE
**(new policies and renewals with no terrorism
exclusion or sublimit and no premium charge)**

You are hereby notified that, under the Terrorism Risk Insurance Act of 2002 (the "Act") effective November 26, 2002, we are making available to you insurance for losses arising out of certain acts of international terrorism.  The policy you are purchasing already includes insurance for such acts. Terrorism is defined as any act certified by the Secretary of the Treasury, in concurrence with the Secretary of State and Attorney General of the United States, to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of an air carrier or vessel or the premises of a United States Mission; and to have been committed by an individual or individuals acting on behalf of any foreign person or foreign interest, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

You should know that the insurance provided by your policy for losses caused by acts of terrorism is partially reimbursed by the United States under the formula set forth in the Act.  Under this formula, the United States pays 90% of covered terrorism losses that exceed the statutorily established deductible to be paid by the insurance company providing the coverage.  The portion of the offered policy's annual premium that is attributable to insurance for acts of terrorism is: **$ -0-.**

If you have any questions about this notice, please contact your agent or broker.



**IRONSHORE INDEMNITY INC.**
(A Stock Company)
Mailing Address:
PO Box 3407
New York, NY  10008
(877) IRON411

**Policy Number:**  002642701

# EXCESS LIABILITY INSURANCE POLICY

**I.   INSURING AGREEMENT**

In consideration of the payment of the premium and in reliance upon all statements made in the application for this Policy and the Followed Policy, including the information furnished in connection therewith, whether directly or through public filing, and subject to all terms, definitions, conditions, exclusions and limitations of this policy, the Insurer agrees to provide insurance coverage to the Insureds in accordance with the terms, definitions, conditions, exclusions and limitations of the Followed Policy, except as may be otherwise provided in this Policy.

**II.   LOSS PAYABLE PROVISION**

It is agreed the Insurer shall pay the Insured as defined in the Followed Policy for Loss by reason of exhaustion by payments of all Underlying Policy Limits of all underlying policies by the underlying insurers issuing such underlying policies and/or the Insureds, subject to i) the terms and conditions of the Followed Policy as that form is submitted to the Insurer; ii) the Limit of Liability as stated in Item 6 of the Declarations; and iii) the terms and conditions of, and the endorsements attached to, this Policy. In no event shall this policy grant broader coverage than would be provided by the Followed Policy.

**III.   DEFINITIONS**

A.   The Terms "Insurer" and "Followed Policy" shall have the meanings attributed to them in the Declarations.

B.   The term "Insureds" means those individuals and entities insured by the Followed Policy.

C.   The term "Policy Period" means the period set forth in Item 4 of the Declarations.

D.   The term "Underlying Policy Limits/Attachment Point" means an amount equal to the aggregate of all limits of liability as set forth in Item 7 of the Declarations for all Underlying Policies, plus the uninsured retention, if any, applicable to the Underlying Policies.

**IV.   POLICY TERMS**

A.   This policy is subject to the same representations contained in the Application for the Followed Policy and has the same terms, definitions, conditions, exclusions and limitations (except as regards the premium, the limits of liability, the policy period and as may be otherwise in this Policy) as are contained in the Followed Policy.

B.   If during the Policy Period or any Discovery Period the terms, conditions, exclusions or limitations of the Followed Policy are changed in any manner, the Insureds shall as a condition precedent to their rights to

coverage under this policy give to the Insurer written notice of the full particulars thereof and secure the Insurers affirmative consent to such modification before coverage will be effective.

C.      As a condition precedent to their rights under this policy, the Insureds shall give to the Insurer as soon as practicable written notice in accordance with the terms, conditions, definitions, exclusions and limitations of the Followed Policy.

D.      Notwithstanding any of the terms of this policy which might be construed otherwise, this policy shall drop down only in the event of reduction or exhaustion of the Underlying Limit and shall not drop down for any other reason including, but not limited to, uncollectibility (in whole or in part) of any Underlying Limits.  The risk of uncollectibility of such Underlying Limits (in whole or in part) whether because of financial impairment or insolvency of an underlying insurer or for any other reason, is expressly retained by the Insureds and is not in any way or under any circumstances insured or assumed by the carrier.

Ironshore Indemnity Inc. by:

Secretary                                           President



**IRONSHORE INDEMNITY INC.**

(A Stock Company)

Mailing Address:

PO Box 3407

New York, NY  10008

(877) IRON411

**Endorsement #** 1

**Policy Number:** 002642701                                              **Effective Date of Endorsement:** February 22, 2017

**Insured Name:**  SPM Corporate Services LLC; SPM Prof Services, Inc.; SPM Software, Inc.; Turbine Cloud Svcs, LLC

# OFAC COMPLIANCE NOTICE

Payment of Loss under this Policy shall only be made in full compliance with all United States of America economic or trade sanction laws or regulations, including, but not limited to, sanctions, laws and regulations administered and enforced by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC").



**IRONSHORE INDEMNITY INC.**

(A Stock Company)
Mailing Address:
PO Box 3407
New York, NY  10008
(877) IRON411

**Endorsement #** 2

**Policy Number:** 002642701                               **Effective Date of Endorsement:** February 22, 2017
**Insured Name:**  SPM Corporate Services LLC; SPM Prof Services, Inc.; SPM Software, Inc.; Turbine Cloud Svcs, LLC

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# NO AGGREGATE LIMIT OF LIABILITY

This endorsement modifies insurance provided under the following:

**EXCESS LIABILITY INSURANCE POLICY**

It is hereby understood and agreed that the DECLARATIONS, Item 6. Limit of Liability/Aggregate Limit is deleted in its entirety and replaced by the following:

**ITEM 6. LIMIT OF LIABILITY:** $9,500,000

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

_____                     February 28, 2017
Authorized Representative                            Date

EXC.END.086 (0316)                                                          Page 1 of 1